**In re GRAND JURY SUBPOENA DUCES TECUM.**

Civ. No. 72–292.

United States District Court,
D. Maryland.

April 23, 1973.

See, also, D.C., 342 F.Supp. 709.

**662**

Walter E. Black, Jr., H. Russell Smouse, and Thomas C. Beach, III, Baltimore, Md., for William L. Kahler.

Russell T. Baker, Jr., and Barnet D. Skolnik, Asst. U. S. Attys., D. Md., for United States.

## MEMORANDUM OPINION

BLAIR, District Judge.

In the course of an investigation of William L. Kahler by a grand jury of the District of Maryland, two subpoenae duces tecum were issued out of this court requiring the production of certain documents. The first subpoena was directed to the Custodian of Records of the law firm of Kahler, DeBlasis, Shipley & O'Malley and the second, to Walter E. Black, Jr., Esquire, an attorney for William L. Kahler. Each, in substantially identical language, directed the summoned individual to appear before the grand jury to testify and to bring with him specified documents in his possession belonging to any law firms in which William L. Kahler, Samuel J. DeBlasis, Russell W. Shipley or Peter F. O'Malley "is or was a member between 1960 and the present." In substance, the subpoenae called for the production of various documents relating to transactions between the above-mentioned law firms and Ralph D. Rocks and several of the enterprises and joint ventures with which the latter had been associated.

Pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure, Black has moved to quash the subpoena duces tecum directed to him; and Kahler, who had previously been granted leave to intervene in the proceedings, has moved to quash the subpoenae duces tecum directed to both the Custodian of Records and Black. All motions assert that the subpoenae are violative of Kahler's rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and, additionally, the Black motion asserts a violation of the attorney-client privilege.

■ For the convenience of addressing the single substantial issue involved, the court will first dispose of those issues which it deems to be lacking in substance. Initially, the court observes that it is faced with the unusual contention that the subpoenae duces tecum in the instant case will somehow violate Kahler's Fourteenth Amendment rights. Suffice it to say that the language of that amendment clearly shows that its prohibitions are directed toward the states and it has no application to the federal government—the sovereign whose subpoenae have been challenged here. *See* Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Fourth Amendment contentions raised by the motions are equally without merit. It is clear that they are addressed to the concept of an unreasonable search and seizure, and, as will be discussed later, turn on questions of vagueness and overbreadth only. The court does not perceive that the subpoenae duces tecum here involved are vulnerable to such an attack and, indeed, counsel for the movants have apparently so conceded in argument.

■ The third issue which is ripe for preliminary disposition is the assertion, made by both movants, that the

documents to which the subpoenae are directed are in fact the personal papers of Kahler so that his Fifth Amendment privilege against self-incrimination would be effective to prohibit their involuntary production. The court concludes that this proposition is lacking in substance also. The subpoena directed to Black is quite specific and "calls only for the production of the property of any and all law partnerships of which William L. Kahler, Samuel J. DeBlasis, Russell W. Shipley, and/or Peter F. O'Malley is or was a member between 1960 and the present, and does not require or request the production of the property of any individual." A fair reading of the subpoena addressed to the Custodian of Records of the law partnership leads the court to conclude that it, too, is directed to partnership records only. Kahler, in his motion, attempts to circumvent the language of the subpoenae by analogizing the records sought to home and family records rather than to the files created and maintained by his law firm in the course of its representation of clients. However, it is clear that if the records sought are not truly personal records, "plainly he could not make  .  .  . [them] his private or personal [records] by keeping copies of personal letters in them." Wilson v. United States, 221 U. S. 361, 378, 31 S.Ct. 538, 543, 55 L.Ed. 771 (1911). And to the extent that they truly are personal records which have come into the hands of a third party, the general rule is that neither the owner of the records nor the third party may resist production. This is because the constitutional privilege against divulging incriminatory information is a personal one. It does not prevent disclosure of information but it only protects the individual from being "compelled in any criminal case to be a witness against himself." United States Constitution, Amendment V. *See* Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); Johnson v. United States, 228 U. S. 457, 33 S.Ct. 572, 57 L. Ed. 919 (1913).

The assertion of the attorney-client privilege is likewise unavailing. The subpoena directed to Black does not require disclosure of any documents embodying the confidential communications between an attorney and his client. As was previously mentioned, it is clear beyond cavil in the case of the subpoena addressed to Black that only law partnership records need be produced. No confidential communications between the attorney and the client are called for by the subpoena. Thus, the attorney-client privilege, as it is generally recognized, is not breached. *See generally*, McCormick on Evidence, § 89 (2d Ed. 1972). The movants, however, assert that the attorney-client privilege would be a bar to the production of these documents on the theory that they would have been privileged had they remained within Kahler's possession. Authority for this proposition does exist. *See* Colton v. United States, 306 F.2d 633 (2d Cir. 1962), cert. denied, 371 U.S. 951, 83 S. Ct. 505, 9 L.Ed.2d 499 (1963). This contention need not be resolved since, as will be discussed later, the court holds that Kahler has no Fifth Amendment privilege in these records.

Additionally, at this point, it seems appropriate to remember that the Fifth Amendment prohibition on self-incrimination

reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,  .  .  ." [citation omitted.]

Murphy v. Waterfront Comm'n., 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). Nonetheless, this privilege is essentially personal in nature and must be asserted by the individual to whom any compulsion is directed. It may not be invoked on behalf of another nor does its protections extend to artificial entities such as corporations or associations. *See* Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (January 9, 1973); United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944).

■ Thereby the court reaches the remaining and vital issue in the case. That is, whether, under the facts here present, a partner in a law firm has such a personal interest in the files of that firm so that he may assert his Fifth Amendment privilege against self-incrimination as a bar to the involuntary production of these files. This court concludes he may not. At the outset, however, candor compels acknowledgment that authority to the contrary exists. In addressing this question, it should be remembered that while there are two subpoenae duces tecum involved in the motions, neither is directed to Kahler but rather one is directed to Kahler's attorney, Black, and the other, to the Custodian of Records of Kahler's law firm. However, to simplify the court's discussion of the issues involved, it will assume that both subpoenae have been addressed to Kahler. The reason for this is simple. If Kahler's constitutional rights would not prevent the involuntary production of the documents in question if in his possession, they certainly would be ineffective to prevent the production of the documents in another's hands. *Cf.* Falsone v. United States, 205 F.2d 734 (5th Cir. 1953), cert. denied, 346 U.S. 864, 74 S.Ct. 103, 98 L.Ed. 375 (1953).

The starting point for the court's analysis is the case of Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L. Ed. 746 (1886). In that case, the Supreme Court held that a subpoena duces tecum commandng the production of an invoice for a quantity of glass that had, allegedly, been imported in violation of federal law violated the constitutional rights of the parties to whom it was directed. The rationale for that decision was that requiring persons to produce private papers which would tend to incriminate them was not only a violation of the Fourth Amendment's prohibition against unreasonable searches and seizures but also a violation of the Fifth Amendment's ban on compulsory self-incrimination. This double application of constitutional protection was not long lived. The Supreme Court, in Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L. Ed. 652 (1906), concluded that when a witness is precluded from invoking the Fifth Amendment because he is immune from criminal prosecution a subpoena duces tecum will not run afoul of the Fourth Amendment's prohibition against unreasonable searches and seizures unless it is too broad in its scope. Because of this holding, Fourth Amendment challenges to a subpoena duces tecum are limited to the considerations of overbreadth and vagueness. *See* In Re Mal Brothers Contracting Co., 444 F.2d 615 (3d Cir. 1971).

The remains of *Boyd,* now limited to the Fifth Amendment doctrine, are considerably less expansive than when enunciated in 1886. Not long after the *Hale* decision, the Supreme Court in Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911), decided that a corporate officer having custody of corporate records which would tend to incriminate him had no Fifth Amendment privilege to refuse to produce them in response to a subpoena duces tecum. In Wheeler v. United States, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309 (1913), this holding was extended to encompass the custodians of the records of a dissolved corporation. In that case, the subpoena duces tecum was served on persons who had been the principals and officers of a corporation since dissolved. It commanded the production of certain papers of the former corporation which had been transferred to the individuals

upon the dissolution of the corporation and which were claimed by them to be their personal property. The Court concluded that the Fifth Amendment's prohibition on self-incrimination did not become effective to prevent production of the records merely because the corporation had gone out of existence. The reason was "[s]uch books and papers still remained subject to inspection and investigation, and no constitutional right of the defendants was violated when, being found in possession of the documents, they were required to produce them for inspection by the grand jury." Similarly, in Grant v. United States, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423 (1913), the Supreme Court, with but a quick backward glance at *Wilson* and *Wheeler,* had no difficulty in concluding that the sole stockholder of a corporation which had ceased to do business had no Fifth Amendment privilege which would preclude the production of that corporation's business records.

In each of these cases in which corporations were involved, the Court reasoned that the records were not the property of the individual but instead belonged to the corporate entity. It mattered not that the corporation had been dissolved; that upon dissolution the records had been transferred to the individual; or that the individual claiming Fifth Amendment rights was actually the only stockholder of the corporation during its existence. A corporation, the reasoning continued, had no right against self-incrimination under the Fifth Amendment. This, as the Court pointed out, was because the corporation was created by statute with the power to act only within the laws of the state. Thus, it would be absurd to prevent the state from monitoring the records of its creation to determine whether its actions had exceeded the scope of its powers. Furthermore, since the Court concluded that this visitorial power could also be exercised by the federal government, it followed that either sovereign had an absolute right to inspect the corporate records. Because of this, no individual

could withhold production of corporate documents on the grounds that their contents might incriminate him. This was because the individual's possession of them was in a representative capacity only, so that disclosure of their contents did not infringe upon his individual constitutional rights.

And so if the records were those of a corporation, the applicable principles of law were clear and lent themselves to easy application. Or so it seemed. But what rights obtained and what principles governed where the records sought were those of an unincorporated association which an individual claimed would tend to incriminate him? In the leading case of United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944), the Supreme Court faced precisely this question. It reaffirmed its prior holdings that "individuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges." *Id.* at 699, 64 S.Ct. at 1251. Thus, it was made clear that the custodian of an organization's records may not withhold them from governmental scrutiny because their contents might tend to incriminate him personally. In so holding, the Court rejected the theory, used in the corporate cases, that the reservation of visitorial power by the state was solely responsible for the inapplicability of the personal protections embodied in the Constitution. Instead, the test of whether an individual possessed the records in a representative capacity was "whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only." *Id.* at 701, 64 S.Ct. at 1252.

The Supreme Court has not yet fully explored the extent to which constitutional rights may be asserted with re-

spect to business documents which might incriminate a member of the unincorporated association. A number of lower courts, however, have had to squarely face this issue. In many of those cases, the court began its analysis by assuming that, because in *Boyd* the subpoena was directed to a partnership, a general partner may refuse to produce documents if their contents are incriminatory unless a different result was mandated by the court's decision in *White*.

A good example of this analysis is contained in United States v. Cogan, 257 F.Supp. 170 (S.D.N.Y.1966), a decision heavily relied upon by the movants in the instant case. There the court observed that no "case where a general partnership—with its life measured by the survival and adherence of the partners, with property, management, responsibility, and fiduciary duty all organized in the traditional way—has been held to be within the principles of United States v. White." *Id.* at 173. However, in that case, it appears that the court assumed that the impersonality test of *White* was measured primarily by the size of the organization whose records were subpoenaed. *See also,* United States v. Linen Service Council, 141 F.Supp. 511 (D.N.J.1956); United States v. Lawn, 115 F.Supp. 674 (S.D.N.Y.1953); In Re Subpoena Duces Tecum, 81 F.Supp. 418 (N.D.Cal.1948). Other courts, while accepting this legal analysis, have gone to great lengths to conclude that the partnerships which they were evaluating were impersonal entities because of their size or because of the existence of limited partners having no managerial rights. *See* In Re Mal Brothers Contracting Co., 444 F.2d 615 (3d Cir. 1971); United States v. Silverstein, 314 F.2d 789 (2d Cir. 1963), aff'g, 210 F.Supp. 401 (S.D. N.Y.1962), cert. denied, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1031 (1963); United States v. Onassis, 125 F.Supp. 190 (D.D.C.1954).

This court is unable to agree with those cases which look to size as the most important criterion in determining the personality of an organization.

Therefore, it does not agree with the movant's position that a law firm having four partners is a small personal organization merely because it has only four members. A careful reading of *White* indicates to this court that the considerations which influenced the Supreme Court in reaching its decision transcend notions of size and are equally applicable to all organizations, both the large and the small.

The *White* Court began its opinion by reiterating those constitutional principles which had evolved from the cases in which corporate records had been subpoenaed. Namely that the Fifth Amendment privilege against self-incrimination is a personal one which "cannot be utilized by or on behalf of any organization, such as a corporation," and that individuals are not "entitled to their purely personal privileges" when "acting as representatives of a collective group." 322 U.S. at 699, 64 S.Ct. at 1251. Thus, the Court reaffirmed its prior decisions which held that books and records of an organization may not be withheld from governmental scrutiny because their contents would incriminate a member of the organization. The reason for this, it was stated, was that such papers are not the private property of an individual but instead belong to the membership of the organization. As such, they are open for inspection by the members so that they "embody no element of personal privacy and carry with them no claim of personal privilege." *Id.* at 700, 64 S.Ct. at 1252.

The Court then proceeded to elaborate upon the policy considerations underlying these principles. In the Supreme Court's view, the scope and nature of an organization's business activities are factors which may necessitate effective governmental regulation. This end would be thwarted if the cloak of privilege encompassed the records of an organization because it is likely that the evidence of an organization's or its representative's wrongdoing is contained within the official files of the business. And so the Court concluded that

the power to compel the production of the records of any organization, whether it be incorporated or not, arises out of the inherent and necessary power of the federal and state governments to enforce their laws, with the privilege against self-incrimination being limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records. *Id.* at 700–701, 64 S.Ct. at 1252.

The Court then compared the organizational structure of the labor union whose records were subpoenaed against the backdrop of the above-mentioned considerations. In doing this, the Court examined every facet of the union's organization in relation to its membership. As a result of this comparison, the Court concluded that the union was an entity, separate and distinct from that of its membership. Therefore, the personal privilege of self-incrimination would not prohibit the involuntary production of official records.

█ █ Because of the universal applicability of the principles of law and the detailed comparison of the organization and its membership undertaken by the Supreme Court, this court concludes that *White* stands for the proposition that, with respect to the books, records and papers of an organization, the personal constitutional privileges of a member may be asserted only when the identity of the association and its member are coincident. This means that if the business has the attributes of an entity separate from its membership, the Fifth Amendment privilege against self-incrimination may not be asserted by the member. This is true even if the contents of the business records will incriminate any or all of the individual members.

█ Authoritative support for this reading of *White* is remarkably sparse. However, indications of its soundness do exist. Although never enunciating fully the meaning of *White,* the Supreme Court has, on occasion, been called upon to determine whether a member of an organization can assert his constitutional rights with respect to the records of an organization. In none of these cases did the Court discuss either the size or the personal or impersonal nature of the organization. Instead, it focused its attention on the representative nature of the document's possession. Thus in Rogers v. United States, 340 U.S. 367, 71 S. Ct. 438, 95 L.Ed. 344 (1950), the Court cited *White* for the proposition that "[b]ooks and records kept 'in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination. . . .' " *Id.* at 372, 71 S.Ct. at 441. And in Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957), the Court again cited *White* for the proposition that personal privileges are inapplicable to records held in a representative capacity. To the same effect was the discussion of *White* in McPhaul v. United States, 364 U.S. 372, 81 S.Ct. 138, 5 L.Ed.2d 136 (1960). Thus, this court concludes that, in the instant case, its attention should be directed to whether the law firm in question has an identity sufficiently separate and distinct from its members so that it can be said that the documents sought were held in a representative capacity and not to size of the law firm or to number of people it employed.

No evidence respecting the law firm in question has been presented to this court but, from the representations made by counsel in memoranda and argument, it may be accepted for the purposes of this proceeding as a typical law firm with four partners organized under and governed by the Uniform Partnership Act contained in Article 73A of the Annotated Code of Maryland. Under that law, as adopted in Maryland, every partner is an agent of the partnership for the purpose of its business; yet no one partner may assign partnership property, confess judgment or submit a partnership claim or liability to arbitration or reference. *Id.* at § 9. No partner

has the exclusive right to possess the partnership books and records but they must be kept at the partnership's place of business so that each partner may have unrestricted access to them at all times. *Id.* at § 19. Property of the partnership is owned by the partners as tenants in partnership and no partner has the right to possess partnership property for other than partnership purposes without the consent of his partners, nor is that property subject to the creditors of an individual partner. *Id.* at § 25. Furthermore, his partnership interest is available to an individual partner's creditor only after his creditor obtains a charging order against the debtor's partnership interest. *Id.* at § 28. Additionally, partners are jointly and severally liable for the debts of the partnership, *Id.* at § 15, and on dissolution, the partnership is not terminated but continues until the winding up of partnership affairs is completed. *Id.* at § 29 et seq.

The cumulative effect of these and other provisions indicates that the Uniform Partnership Act endowed the partnership with an identity which, for some purposes, does not coincide with that of the individual partners. This has been recognized in both the statutes and case law of this state. For example, in Article 81, § 2, of the Annotated Code of Maryland, which deals with revenue and taxes, a partnership is deemed a taxable entity residing in the county of its principal place of business. And in David v. David, 161 Md. 532, 157 A. 755, 757 (1932), the Court of Appeals of Maryland acknowledged that "for some purposes a partnership may be regarded as a legal entity." *See also*, McLane v. Tax Court, 156 Md. 133, 143 A. 656 (1928); Hopkins v. Baker, 78 Md. 363, 28 A. 284 (1894).

Because of the aforementioned rights and restrictions which, pursuant to the Uniform Partnership Act, apply to the members of a traditional partnership and in the absence of proof of a partnership agreement or other relationship altering these statutory provisions, the court concludes that for the purpose of asserting the Fifth Amendment protection against self-incrimination a partnership has an identity separate and distinct from that of the individual partners. For this reason, the court believes that a partnership composed of four general partners who have associated themselves voluntarily for the practice of a profession, the principal purpose of which it may be assumed is the representation of client interests, does have sufficient attributes as an entity to be treated, in this case, as no different than a corporation or other impersonal business association. Therefore, any records belonging to the partnership are possessed by a partner in a purely representative capacity. For this reason, a partner who possesses these records may not refuse to produce them because their contents may tend to incriminate him. *See* United States v. Onassis, 133 F.Supp. 327 (S.D.N.Y. 1955).

In reaching this conclusion, the court is not unmindful of the case of United States v. Cogan, 257 F.Supp. 170 (S.D. N.Y.1966), which reached an opposite conclusion. However, this court does not believe that the application of constitutional rights should be dependent upon the form rather than the substance of how men organize themselves for the pursuit of their business or professional ends. That is, the business which is incorporated pursuant to the close corporation statute of Maryland, Annotated Code of Maryland, Article 23, §§ 100–111, cannot be said to differ appreciably from that which operates within the confines of the Uniform Partnership Act. And the lawyers or other professionals who choose to conduct the practice of their profession in a corporate form known as a "professional association", *see* Annotated Code of Maryland, Article 23, §§ 430–44, do not differ from their brothers who opt for the more traditional form of practice.

Accordingly, in the absence of any countervailing considerations, this court holds that in the case of a law firm or-

ganized under the partnership laws of Maryland with four general partners associated in the practice of their profession, the records of that firm reflecting the transactions between the firm and the clients of that firm are sufficiently impersonal insofar as the partner is concerned to require their production without violating the partner's constitutional right against compulsory self-incrimination. Although exceptions to this holding may exist, for the present it is better that they remain untouched since, within the context of the instant case, they need not be resolved.

Lastly, it should be mentioned that the court's conclusions were made on the basis of the facts presented by the attorneys in memoranda and argument. No evidence was presented nor proffered. It is clear that a court need not accept the naked assertion that an answer to a question or the production of a document will incriminate the one claiming the privilege. Although the person claiming the privilege is not required to disclose the evidence he seeks to suppress, it must be apparent to the court from the totality of the circumstances that the disclosure of the information sought could prove to be incriminatory. Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). At the hearing on the motion, nothing was presented to the court which would rise above the naked assertion of possible self-incrimination. None of the records which the subpoenae directed be produced were presented to the court nor was the court invited to make an *in camera* inspection of the records in whole or in part. In sum, all the court had before it was the factually unsupported claim that the records would tend to incriminate Kahler. This alone would be sufficient to deny the motions to quash.

An Order consistent with this opinion denying the three motions to quash has earlier been entered.