## BELLIS v. UNITED STATES

No. 73-190.   Argued February 25, 1974—Decided May 28, 1974

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 101.

*Leonard Sarner* argued the cause for petitioner. With him on the briefs was *Louis Lipschitz.*

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Crampton, Stuart A. Smith,* and *Meyer Rothwacks.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The question presented in this case is whether a partner in a small law firm may invoke his personal privilege against self-incrimination to justify his refusal to comply with a subpoena requiring production of the partnership's financial records.

Until 1969, petitioner Isadore Bellis was the senior partner in Bellis, Kolsby & Wolf, a law firm in Philadelphia. The firm was formed in 1955 or 1956. There were three partners in the firm, the three individuals listed in the firm name. In addition, the firm had six employees: two other attorneys who were associated with the firm, one part-time; three secretaries; and a receptionist. Petitioner's secretary doubled as the partnership's bookkeeper, under the direction of petitioner and the firm's independent accountant. The firm's financial records were therefore maintained in petitioner's office during his tenure at the firm.

Bellis left the firm in late 1969 to join another law firm. The partnership was dissolved, although it is apparently still in the process of winding up its affairs. Kolsby and Wolf continued in practice together as a new partnership, at the same premises. Bellis moved to new offices, leaving the former partnership's financial records with Kolsby and Wolf, where they remained for more than three years. In February or March 1973, however, shortly before issuance of the subpoena in this case, petitioner's secretary, acting at the direction of petitioner or his attorney, removed the records from the old premises and brought them to Bellis' new office.

On May 1, 1973, Bellis was served with a subpoena directing him to appear and testify before a federal grand jury and to bring with him "all partnership records currently in your possession for the partnership of Bellis, Kolsby & Wolf for the years 1968 and 1969." App. 6. Petitioner appeared on May 9, but refused to produce the records, claiming, *inter alia*, his Fifth Amendment privilege, against compulsory self-incrimination. After a hearing before the District Court on May 9 and 10, the court held that petitioner's personal privilege did not extend to the partnership's financial books and records, and ordered

their production by May 16.[1]  When petitioner reappeared before the grand jury on that date and again refused to produce the subpoenaed records, the District Court held him in civil contempt, and released him on his own recognizance pending an expedited appeal.

On July 9, 1973, the Court of Appeals affirmed in a *per curiam* opinion.  *In re Grand Jury Investigation,* 483 F. 2d 961 (CA3 1973).  Relying on this Court's decision in *United States* v. *White,* 322 U. S. 694 (1944), the Court of Appeals stated that "the privilege has always been regarded as personal in the sense that it applies only to an individual's words or personal papers" and thus held that the privilege against self-incrimination did not apply to "records of an entity such as a partnership which has a recognizable juridical existence apart from its members."  483 F. 2d, at 962.  After MR. JUSTICE WHITE had stayed the mandate of the Court of Appeals on August 1, we granted certiorari, 414 U. S. 907 (1973), to consider this interpretation of the Fifth Amendment privilege and the applicability of our *White* decision in the circumstances of this case.  We affirm.

It has long been established, of course, that the Fifth Amendment privilege against compulsory self-incrimination protects an individual from compelled production of his personal papers and effects as well as compelled oral testimony.  In *Boyd* v. *United States,* 116 U. S. 616 (1886), we held that "any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime" would violate the Fifth Amendment privilege.  *Id.,* at 630; see also *id.,* at 633–635; *Wilson* v. *United States,* 221 U. S. 361, 377 (1911).  The privilege applies to the business records of

---

[1] Although the wording of the subpoena was arguably broad enough to encompass them, the District Court expressly excluded any client files from the scope of its order.

the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life. *Boyd* v. *United States, supra; Couch* v. *United States,* 409 U. S. 322 (1973); *Hill* v. *Philpott,* 445 F. 2d 144 (CA7), cert. denied, 404 U. S. 991 (1971); *Stuart* v. *United States,* 416 F. 2d 459, 462 (CA5 1969). As the Court explained in *United States* v. *White, supra,* at 698, "[t]he constitutional privilege against self-incrimination . . . is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him." See also *Curcio* v. *United States,* 354 U. S. 118, 125 (1957); *Couch* v. *United States, supra,* at 330–331.

On the other hand, an equally long line of cases has established that an individual cannot rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally. This doctrine was first announced in a series of cases dealing with corporate records. In *Wilson* v. *United States, supra,* the Court held that an officer of a corporation could not claim his privilege against compulsory self-incrimination to justify a refusal to produce the corporate books and records in response to a grand jury subpoena *duces tecum* directed to the corporation. A companion case, *Dreier* v. *United States,* 221 U. S. 394 (1911), held that the same result followed when the subpoena requiring production of the corporate books was directed to the individual corporate officer. In *Wheeler* v. *United States,* 226 U. S. 478 (1913), the Court held that no Fifth Amendment privilege could be claimed with respect to corporate records even though the corporation had previously been dissolved. And

*Grant* v. *United States,* 227 U. S. 74 (1913), applied this principle to the records of a dissolved corporation where the records were in the possession of the individual who had been the corporation's sole shareholder.

To some extent, these decisions were based upon the particular incidents of the corporate form, the Court observing that a corporation has limited powers granted to it by the State in its charter, and is subject to the retained "visitorial power" of the State to investigate its activities. See, *e. g., Wilson* v. *United States, supra,* at 382–385. But any thought that the principle formulated in these decisions was limited to corporate records was put to rest in *United States* v. *White, supra.* In *White,* we held that an officer of an unincorporated association, a labor union, could not claim his privilege against compulsory self-incrimination to justify his refusal to produce the union's records pursuant to a grand jury subpoena. *White* announced the general rule that the privilege could not be employed by an individual to avoid production of the records of an organization, which he holds in a representative capacity as custodian on behalf of the group. 322 U. S., at 699–700. Relying on *White,* we have since upheld compelled production of the records of a variety of organizations over individuals' claims of Fifth Amendment privilege. See, *e. g., United States* v. *Fleischman,* 339 U. S. 349, 357–358 (1950) (Joint Anti-Fascist Refugee Committee); *Rogers* v. *United States,* 340 U. S. 367, 371–372 (1951) (Communist Party of Denver); *McPhaul* v. *United States,* 364 U. S. 372, 380 (1960) (Civil Rights Congress). See also *Curcio* v. *United States, supra* (local labor union).

These decisions reflect the Court's consistent view that the privilege against compulsory self-incrimination should be "limited to its historic function of protecting only the natural individual from compulsory incrimination through

his own testimony or personal records." *United States* v. *White, supra,* at 701. *White* is only one of the many cases to emphasize that the Fifth Amendment privilege is a purely personal one, most recent among them being the Court's decision last Term in *Couch* v. *United States*, 409 U. S., at 327–328. Relying on this fundamental policy limiting the scope of the privilege, the Court in *White* held that "the papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity." 322 U. S., at 699. Mr. Justice Murphy reasoned that "individuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges. Rather they assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obligations." *Ibid.*

Since no artificial organization may utilize the personal privilege against compulsory self-incrimination, the Court found that it follows that an individual acting in his official capacity on behalf of the organization may likewise not take advantage of his personal privilege. In view of the inescapable fact that an artificial entity can only act to produce its records through its individual officers or agents, recognition of the individual's claim of privilege with respect to the financial records of the organization would substantially undermine the unchallenged rule that the organization itself is not entitled to claim any Fifth Amendment privilege, and largely frustrate legitimate governmental regulation of such organizations. Mr. Justice Murphy put it well:

> "The scope and nature of the economic activities of incorporated and unincorporated organizations and their representatives demand that the constitu-

tional power of the federal and state governments to regulate those activities be correspondingly effective. The greater portion of evidence of wrongdoing by an organization or its representatives is usually to be found in the official records and documents of that organization. Were the cloak of the privilege to be thrown around these impersonal records and documents, effective enforcement of many federal and state laws would be impossible. The framers of the constitutional guarantee against compulsory self-disclosure, who were interested primarily in protecting individual civil liberties, cannot be said to have intended the privilege to be available to protect economic or other interests of such organizations so as to nullify appropriate governmental regulations." *Id.*, at 700 (citations omitted).

See also *Wilson* v. *United States, supra,* at 384–385.

The Court's decisions holding the privilege inapplicable to the records of a collective entity also reflect a second, though obviously interrelated, policy underlying the privilege, the protection of an individual's right to a " 'private enclave where he may lead a private life.' " *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964). We have recognized that the Fifth Amendment "respects a private inner sanctum of individual feeling and thought"—an inner sanctum which necessarily includes an individual's papers and effects to the extent that the privilege bars their compulsory production and authentication—and "proscribes state intrusion to extract self-condemnation." *Couch* v. *United States, supra,* at 327. See also *Griswold* v. *Connecticut,* 381 U. S. 479, 484 (1965). Protection of individual privacy was the major theme running through the Court's decision in *Boyd,* see, *e. g.,* 116 U. S., at 630, and it was on this basis that the Court in *Wilson* distinguished the corporate records involved in

that case from the private papers at issue in *Boyd*. See 221 U. S., at 377, 380.

But `a substantial claim of privacy or confidentiality cannot often be maintained with respect to the financial records of an organized collective entity. Control of such records is generally strictly regulated by statute or by the rules and regulations of the organization, and access to the records is generally guaranteed to others in the organization. In such circumstances, the custodian of the organization's records lacks the control over their content and location and the right to keep them from the view of others which would be characteristic of a claim of privacy and confidentiality. Mr. Justice Murphy recognized the significance of this in *White;* he pointed out that organizational records "[u]sually, ·if not always, . . . are open to inspection by the members," that "this right may be enforced on appropriate occasions by available legal procedures," and that "[t]hey therefore embody no element of personal privacy." 322 U. S., at 699–700. And here lies the modern-day relevance of the visitorial powers doctrine relied upon by the Court in *Wilson* and the other cases dealing with corporate records; the Court's holding that no privilege exists "where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the [state]," 221 U. S., at 382, can easily be understood as a recognition that corporate records do not contain the requisite element of privacy or confidentiality essential for the privilege to attach.

The analysis of the Court in *White,* of course, only makes sense in the context of what the Court described as "organized, institutional activity." 322 U. S., at 701. This analysis presupposes the existence of an organization which is recognized as an independent entity apart from its individual members. The group must be relatively

well organized and structured, and not merely a loose, informal association of individuals. It must maintain a distinct set of organizational records, and recognize rights in its members of control and access to them. And the records subpoenaed must in fact be organizational records held in a representative capacity. In other words, it must be fair to say that the records demanded are the records of the organization rather than those of the individual under *White*.

The Court in *White* had little difficulty in concluding that the demand for production of the official records of a labor union, whether national or local, in the custody of an officer of the union, met these tests. See *id.*, at 701–703. The Court observed that a union's existence in fact, if not in law, was "as perpetual as that of any corporation," *id.*, at 701, that the union operated under formal constitutions, rules, and bylaws, and that it engaged in a broad scope of activities in which it was recognized as an independent entity. The Court also pointed out that the official union books and records were distinct from the personal books and records of its members, that the union restricted the permissible uses of these records, and that it recognized its members' rights to inspect them. Although the Court was aware that the individual members might legally hold title to the union records, the Court characterized this interest as a "nominal" rather than a significant personal interest in them.

We think it is similarly clear that partnerships may and frequently do represent organized institutional activity so as to preclude any claim of Fifth Amendment privilege with respect to the partnership's financial records. Some of the most powerful private institutions in the Nation are conducted in the partnership form. Wall Street law firms and stock brokerage firms provide significant examples. These are often large, impersonal,

highly structured enterprises of essentially perpetual duration. The personal interest of any individual partner in the financial records of a firm of this scope is obviously highly attenuated. It is inconceivable that a brokerage house with offices from coast to coast handling millions of dollars of investment transactions annually should be entitled to immunize its records from SEC scrutiny solely because it operates as a partnership rather than in the corporate form. Although none of the reported cases has involved a partnership of quite this magnitude, it is hardly surprising that all of the courts of appeals which have addressed the question have concluded that *White*'s analysis requires rejection of any claim of privilege in the financial records of a large business enterprise conducted in the partnership form. *In re Mal Brothers Contracting Co.,* 444 F. 2d 615 (CA3), cert. denied, 404 U. S. 857 (1971); *United States* v. *Silverstein,* 314 F. 2d 789 (CA2), cert. denied, 374 U. S. 807 (1963); *United States* v. *Wernes,* 157 F. 2d 797, 800 (CA7 1946). See also *United States* v. *Onassis,* 125 F. Supp. 190, 205–210 (DC 1954). Even those lower courts which have held the privilege applicable in the context of a smaller partnership have frequently acknowledged that no absolute exclusion of the partnership form from the *White* rule generally applicable to unincorporated associations is warranted. See, *e. g., United States* v. *Cogan,* 257 F. Supp. 170, 173–174 (SDNY 1966); *In re Subpoena Duces Tecum,* 81 F. Supp. 418, 421 (ND Cal. 1948).

In this case, however, we are required to explore the outer limits of the analysis of the Court in *White.* Petitioner argues that in view of the modest size of the partnership involved here, it is unrealistic to consider the firm as an entity independent of its three partners; rather, he claims, the law firm embodies little more than the per-

sonal legal practice of the individual partners. Moreover, petitioner argues that he has a substantial and direct ownership interest in the partnership records, and does not hold them in a representative capacity.[2]

Despite the force of these arguments, we conclude that the lower courts properly applied the *White* rule in the circumstances of this case. While small, the partnership here did have an established institutional identity independent of its individual partners. This was not an informal association or a temporary arrangement for the undertaking of a few projects of short-lived duration. Rather, the partnership represented a formal institutional arrangement organized for the continuing conduct of the firm's legal practice. The partnership was in

[2] Petitioner also argues that we have already decided the issue presented in this case, and held that the Fifth Amendment privilege could be claimed with respect to partnership records, in the *Boyd* case. It is true that the notice to produce involved in *Boyd* was in fact issued to E. A. Boyd & Sons, a partnership. See 116 U. S. 616, 619. However, at this early stage in the development of our Fifth Amendment jurisprudence, the potential significance of this fact was not observed by either the parties or the Court. The parties treated the invoice at issue as a private business record, and the contention that it might be a partnership record held in a representative capacity, and thus not within the scope of the privilege, was not raised. The Court therefore decided the case on the premise that it involved the "compulsory production of a man's private papers." *Id.*, at 622. It was only after *Boyd* had held that the Fifth Amendment privilege applied to the compelled production of documents that the question of the extension of this principle to the records of artificial entities arose. We do not believe that the Court in *Boyd* can be said to have decided the issue presented today. See *United States* v. *Onassis*, 125 F. Supp. 190, 208 (DC 1954).

In any event, the Court in *Boyd* did not inquire into the nature of the Boyd & Sons partnership or the capacity in which the invoice was acquired or held. Absent such an inquiry, we are unable to determine how our decision today would affect the result of *Boyd* on the facts of that case. See *infra*, at 101.

96

existence for nearly 15 years prior to its voluntary dissolution.[3]   Although it may not have had a formal constitution or bylaws to govern its internal affairs, state partnership law imposed on the firm a certain organizational structure in the absence of any contrary agreement by the partners;[4] for example, it guaranteed to each of the partners the equal right to participate in the management and control of the firm, Pa. Stat. Ann., Tit. 59, § 51 (e) (1964), and prescribed that majority rule governed the conduct of the firm's business, § 51 (h).[5] The firm maintained a bank account in the partnership name, had stationery using the firm name on its letter-

---

[3] Petitioner properly concedes that the dissolution of the partnership does not afford him any greater claim to the privilege than he would have if the firm were still active.   Brief for Petitioner 31 n. 12.   Under Pennsylvania law, dissolution of the partnership does not terminate the entity; rather it continues until the winding up of the partnership affairs is completed, Pa. Stat. Ann., Tit. 59, § 92 (1964), which has not yet occurred in this case.   Moreover, this Court's decisions have made clear that the dissolution of a corporation does not give the custodian of the corporate records any greater claim to the Fifth Amendment privilege.   *Wheeler* v. *United States,* 226 U. S. 478, 489–490 (1913); *Grant* v. *United States,* 227 U. S. 74, 80 (1913).   We see no reason why the same should not be true of the records of a partnership after its dissolution.

[4] The record in this case is quite sketchy, and it is unclear whether the partnership here had adopted a formal partnership agreement. Petitioner apparently had a 45% interest in the profits of the firm, which suggests that there may have been such an agreement.   However, there is no indication that any such agreement made any material change in the provisions of state law regarding the management and control of the firm or the rights of the other partners with respect to the firm's financial records.   In any event, the existence of a formal partnership agreement would merely reinforce our conclusion that the partnership is properly regarded as an independent entity with a relatively formal organization.

[5] Pennsylvania has adopted the provisions of the Uniform Partnership Act, which is also in force in 40 other States and the District of Columbia.

head, and, in general, held itself out to third parties as an entity with an independent institutional identity. It employed six persons in addition to its partners, including two other attorneys who practiced law on behalf of the firm, rather than as individuals on their own behalf. It filed separate partnership returns for federal tax purposes, as required by § 6031 of the Internal Revenue Code, 26 U. S. C. § 6031.[6] State law permitted the firm to be sued, Pa. Rule Civ. Proc. 2128, and to hold title to property, Pa. Stat. Ann., Tit. 59, § 13 (3), in the partnership name, and generally regarded the partnership as a distinct entity for numerous other purposes.[7]

Equally important, we believe it is fair to say that petitioner is holding the subpoenaed partnership records in a representative capacity.[8] The documents which

---

[6] As we observed only last Term, a "partnership is regarded as an independently recognizable entity apart from the aggregate of its partners" for a number of purposes under the Internal Revenue Code. *United States* v. *Basye,* 410 U. S. 441, 448 (1973).

[7] Of course, state and federal law do not treat partnerships as distinct entities for all purposes. But we think that partnerships bear enough of the indicia of legal entities to be treated as such for the purpose of our analysis of the Fifth Amendment issue presented in this case. The fact that partnerships are not viewed solely as entities is immaterial for this purpose. See *United States* v. *White,* 322 U. S. 694, 697 (1944).

[8] Petitioner argues that as a partner in the firm, he has an interest in the firm's records as co-owner which entitles him to claim the privilege against self-incrimination. But such an ownership interest exists in a partnership of any size. Moreover, the same ownership interest is presented in the case of a labor union or other unincorporated association. The Court's decision in *White* clearly established that the mere existence of such an ownership interest is not in itself sufficient to establish a claim of privilege. See also *Wheeler* v. *United States,* 226 U. S., at 489–490; *Grant* v. *United States,* 227 U. S., at 79–80.

MR. JUSTICE DOUGLAS argues in dissent that the partnership as an entity is not under investigation by the grand jury, rather that peti-

petitioner has been ordered to produce are merely the financial books and records of the partnership.[9] These reflect the receipts and disbursements of the entire firm, including income generated by and salaries paid to the employees of the firm, and the financial transactions of the other partners. Petitioner holds these records subject to the rights granted to the other partners by state partnership law. Petitioner has no direct ownership interest in the records; rather, under state law, they are partnership property, and petitioner's interest in partnership property is a derivative interest subject to significant limitations. See *Ellis* v. *Ellis*, 415 Pa. 412, 415–416, 203 A. 2d 547, 549–550 (1964). Petitioner has no right to use this property for other than partnership purposes without the consent of the other partners. Pa. Stat. Ann., Tit. 59, § 72 (2) (a). Petitioner is of course accountable to the partnership as

---

tioner is the target of the inquiry. Assuming that this is true, it does not give petitioner any greater claim to the privilege. We have rejected this same argument in holding that the privilege cannot be maintained with respect to corporate records, in words fully applicable here:

"Nor is it an answer to say that in the present case the inquiry before the grand jury was not directed against the corporation itself. The appellant had no greater right to withhold the books by reason of the fact that the corporation was not charged with criminal abuses. That, if the corporation had been so charged, he would have been compelled to submit the books to inspection, despite the consequences to himself, sufficiently shows the absence of any basis for a claim on his part of personal privilege as to them; it could not depend upon the question whether or not another was accused." *Wilson* v. *United States*, 221 U. S. 361, 385 (1911).

[9] Significantly, the District Court here excluded any client files from the scope of its order. See n. 1, *supra*. A different case might be presented if petitioner had been ordered to produce files containing work which he had personally performed on behalf of his clients, even if these files might for some purposes be viewed as those of the partnership.

a fiduciary, § 54 (1), and his possession of the firm's financial records is especially subject to his fiduciary obligations to the other partners. Indeed, Pennsylvania law specifically provides that "every partner shall at all times have access to and may inspect and copy any of [the partnership books]." § 52.[10] To facilitate this right of access, petitioner was required to keep these financial books and records at the firm's principal place of business, at least during the active life of the partnership. *Ibid.* The other partners in the firm were—and still are—entitled to enforce these rights through legal action by demanding production of the records in a suit for a formal accounting. § 55.[11]

It should be noted also that petitioner was content to leave these records with the other members of the partnership at their principal place of business for more than three years after he left the firm. Moreover, the Government contends that the other partners in the firm had agreed to turn the records over to the grand jury before discovering that petitioner had removed them from their offices, and that they made an unavailing demand upon petitioner to return the records. Whether or not petitioner's present possession of these records is an unlawful infringement of the rights of the other partners, this provides additional support for our conclusion that it is the organizational character of the records and the representative aspect of petitioner's present possession of

[10] The Court in *White,* in pointing out that union records were generally open to inspection by the members, 322 U. S., at 699–700, relied upon *Guthrie* v. *Harkness,* 199 U. S. 148, 153 (1905), where the Court observed that "the members of an ordinary partnership [have the same right] to examine their company's books."

[11] To implement these rights, Pennsylvania law permits any partner to bring suit against the partnership, and the partnership to sue any partner. Pa. Rule Civ. Proc. 2129.

them which predominates over his belatedly discovered personal interest in them.

Petitioner relies heavily on language in the Court's opinion in *White* which suggests that the "test" for determining the applicability of the Fifth Amendment privilege in this area is whether the organization "has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only." 322 U. S., at 701. We must admit our agreement with the Solicitor General's observation that "it is difficult to know precisely what situations the formulation in *White* was intended to include within the protection of the privilege." Brief for United States 21. The Court in *White,* after stating its test, did not really apply it, nor has any of the subsequent decisions of this Court. On its face, the test is not particularly helpful in the broad range of cases, including this one, where the organization embodies neither "purely . . . personal interests" nor "group interests only," but rather some combination of the two.

In any event, we do not believe that the Court's formulation in *White* can be reduced to a simple proposition based solely upon the size of the organization. It is well settled that no privilege can be claimed by the custodian of corporate records, regardless of how small the corporation may be. *Grant* v. *United States,* 227 U. S. 74 (1913); *Fineberg* v. *United States,* 393 F. 2d 417, 420 (CA9 1968); *Hair Industry, Ltd.* v. *United States,* 340 F. 2d 510 (CA2 1965); cf. *George Campbell Painting Corp.* v. *Reid,* 392 U. S. 286 (1968). Every State has now adopted laws permitting incorporation of professional associations, and increasing numbers of lawyers, doctors, and other professionals are choosing to conduct their business af-

fairs in the corporate form rather than the more traditional partnership. Whether corporation or partnership, many of these firms will be independent entities whose financial records are held by a member of the firm in a representative capacity. In these circumstances, the applicability of the privilege should not turn on an insubstantial difference in the form of the business enterprise. See *In re Grand Jury Subpoena Duces Tecum,* 358 F. Supp. 661, 668 (Md. 1973).

This might be a different case if it involved a small family partnership, see *United States* v. *Slutsky,* 352 F. Supp. 1105 (SDNY 1972); *In re Subpoena Duces Tecum,* 81 F. Supp., at 421, or, as the Solicitor General suggests, Brief for United States 22–23, if there were some other pre-existing relationship of confidentiality among the partners. But in the circumstances of this case, petitioner's possession of the partnership's financial records in what can be fairly said to be a representative capacity compels our holding that his personal privilege against compulsory self-incrimination is inapplicable.

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting.

Bellis, the petitioner, was formerly one of three partners in a small law firm; the partnership was dissolved, and Bellis currently has lawful possession of the firm's records. The grand jury has subpoenaed those records apparently for the purpose of a tax investigation directed against Bellis personally.\* He refused to comply, claiming his Fifth Amendment privilege against self-incrimination, but the Court today holds that privilege not available to Bellis. I think the case is clearly controlled by *Boyd* v. *United States,* 116 U. S. 616, and thus I dissent.

---

\*See App. 24; Tr. of Oral Arg. 8.

In *Boyd* the Court held that the Fifth Amendment privilege extends to the production of papers personally held as well as to the compulsion of testimony. "[W]e have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." 116 U. S., at 633. In purporting to distinguish this case from *Boyd,* the Court relies on *United States* v. *White,* 322 U. S. 694, involving a subpoena directed to a union, not to any individual, for the production of official union documents. *White* in turn relied on cases holding that the privilege against self-incrimination is a personal one, which can be claimed only by natural persons, and not by corporations. *Id.,* at 699, citing *Hale* v. *Henkel,* 201 U. S. 43; *Wilson* v. *United States,* 221 U. S. 361; *Essgee Co.* v. *United States,* 262 U. S. 151. "[T]he papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity." *White, supra,* at 699.

In extending these corporation cases to the union papers involved in *White,* we stressed that the test is not a mechanical one, but "whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only." *Id.,* at 701. In finding that the union was such an impersonal organization, the court pointed out that the union's existence is not dependent upon the life of any member, that it separately owns property apart from any of its members or officers, that its treasury exists apart from the personal funds of its members, and

that without special authorization no member can bind the union. *Id.*, at 701–702. None of these factors is present here in this small three-man law firm. Pennsylvania, as have most States, has adopted the Uniform Partnership Act, Pa. Stat. Ann., Tit. 59, § 1. This partnership would dissolve automatically upon the death of any member, § 93, and any partner can bind the entire partnership in the conduct of its affairs, § 31. No new member can join without unanimous consent of the partners, § 51 (g). In Pennsylvania as in many States a partnership can hold and sell property in its own name, Pa. Stat. Ann., Tit. 15, § 12773; Pa. Stat. Ann., Tit. 59, § 13, but each partner individually is a co-owner of that property, § 72, and in many substantive legal respects the ownership by the partnership is different in kind from ordinary ownership of property. Any legal liabilities arising from property owned by the partnership, of course, extend to the partners individually if the common partnership assets are exhausted, § 37.

I would treat a partnership as *Boyd* treated it. This partnership is as different from a labor union or the run of corporations as black is from white. By the Court's opinion a man and wife who form a law partnership or medical partnership or dental partnership are treated as some kind of new "entity" so as to expand the power of government into an area from which the Fifth Amendment excludes it. The nature of a partnership is not even a federal question; it turns on its creator, the State. Pennsylvania tells us by its Supreme Court that a Pennsylvania partnership "is treated as an aggregate of individuals and not as a separate entity." *Tax Review Board* v. *Shapiro Co.*, 409 Pa. 253, 260, 185 A. 2d 529, 533. For federal income tax purposes the partnership pays no tax, it is merely the conduit through which income passes

to the taxpaying partners. Internal Revenue Code §§ 701, 702, 26 U. S. C. §§ 701, 702.

The majority refers to large law firms or brokerage houses as examples of partnerships which take on the characteristics of independent entities in the manner of corporations. None that I know could properly be considered an organization with "a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents," *White, supra,* at 701. That certainly is not the case presented here. At times the law may treat unlikes as if they were alike; but it surpasses understanding when a two- or three-man partnership is treated the same as members or officers of a giant corporation or a giant union. See *United States v. Cogan,* 257 F. Supp. 170 (SDNY 1966) (Frankel, J.). This small three-man firm had no real existence apart from the three individual attorneys.

All this only goes to demonstrate that Bellis was not holding the records involved here as a representative of some separate, impersonal entity with no rights under the Fifth Amendment. The records he holds are his own, in both a legal and a practical sense. Nor could the grand jury investigation result in any finding of tax liability by the partnership as a separate entity, for the partnership has no tax obligations other than the filing of informational forms that aid in determining the liabilities of the individual partners. It was only Bellis individually, or his two former partners, against whom the investigation could have been directed. If Bellis had been conducting a solo practice, his claim of privilege could not be overridden, as the Government here necessarily conceded. I am unable to perceive why he should be held to have forfeited that constitutional right by joining with two others in a partnership.

Indeed, the significance of the distinction is so obscure that the Court did not even see fit to notice it in *Boyd* itself, where in fact the subpoena was directed at a partnership and not an individual. As the Government here concedes, Brief for United States 14 n. 10, both parties and the Court assumed in *Boyd* that the partnership documents there sought were personal property.

"This command of the Fifth Amendment . . . registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.' Time has not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit." *Ullmann* v. *United States,* 350 U. S. 422, 426. But it is the niggardly view which prevails today, with the Court effectively overruling *Boyd* in holding that the Government can compel an individual to produce his private records to aid a Government investigation of him. That is a view I cannot join.