Jasen, J.
(concurring in part and dissenting in part). I concur in the majority’s determination that Tape No. 1 is subject to the marital privilege and cannot be obtained by the Grand Jury either to evaluate its contents or condition. I cannot agree, however, that, on the record before us, it is proper to quash the Grand Jury’s subpoena as to Tape No. 2. Therefore, I dissent from that portion of the majority’s decision.
*81 The Appellate Division, after listening to Tape No. 1, found it to contain statements by Dr. Rosen which were “made in reliance on the marital relationship and would not have been made but for this relationship.” (87 AD2d 528.) That court also found that the tape remained, despite being given to others for safekeeping or transfer, confidential.
The record indicates that the tape was marked for Mrs. Rosen and was left in the Rosen home where she would find it. There is no allegation that anyone discovered or handled it before she did. Before she forwarded it to attorney Olick, she sealed it in a package. I would agree that the record clearly supports the determination that this was a confidential communication made in the marital relationship. It is, thus, proper to protect that tape in all respects.
As to Tape No. 2, which was left by Dr. Rosen for his medical colleagues, I have no dispute with the majority’s initial analysis that attorney Rosner cannot assert Dr. Rosen’s Fifth Amendment rights. The law is clear that the Fifth Amendment is a personal right that cannot be asserted by third parties. (See, e.g., Couch v United States, 409 US 322; Fisher v United States, 425 US 391, 396-401.) Rosner, to whom the subpoena is directed, clearly has no Fifth Amendment claim of his own to raise since what he is being compelled to produce are not even arguably his private papers or self incriminating. Thus, except for the existence of the attorney-client privilege, Rosner could raise no Fifth Amendment claim. It is at this point that I differ with the majority’s construction of the facts and the implications drawn therefrom.
Rosner asserts that the attorney-client privilege attaches because the tapes were given to him by Mrs. Rosen at her husband’s direction and for the purpose of obtaining legal advice. But Rosner does not claim that he had ever listened to either of the tapes in order to dispense legal advice. Given this testimony, I can conclude only that the client disclosed nothing more than the existence of the tape to his attorney. Since the tape has been held at different *82 times by at least five persons other than Dr. Rosen, its existence can hardly be deemed confidential.
It is likewise improper to conclude, on the basis of this record, that the tape was given for legal advice. While attorney Rosner asserts that it was given to him for legal advice, he offers nothing in support of this assertion. It is difficult to envision what type of legal advice could be obtained by giving one’s attorney a cassette tape which the attorney does not listen to.
The purpose of the attorney-client privilege is to “foster openness between counsel and client so that legal problems can be thoroughly and accurately analyzed (see 8 Wig-more, Evidence [McNaughton rev, 1961], § 2291).” (Majority opn, at p 76.) In this case, it would appear quite obvious that the tapes were given to the attorney not to allow a thorough analysis of the contents of the tapes in order to give counsel to the client’s legal problems but, rather, an attempt to secure the tape from any investigation, including that of the Grand Jury. Indeed, the existence of this second tape was not even known to the investigators or the Grand Jury until Rosner appeared in opposition to the Grand Jury’s subpoena of Tape No. 1.
This, of course, is not to say that any statements made by Dr. Rosen as to what was on the tape would not be privileged. Such communication, assuming it was done in confidence, would relate to Dr. Rosen’s legal problems and be subject to the attorney-client privilege. But I cannot agree with invoking the attorney-client privilege when the attorney serves as nothing more than a repository for potentially incriminating evidence. It is not the purpose of the attorney-client privilege to thwart a criminal investigation and invoking it to preclude a Grand Jury from carrying out its constitutional responsibilities of investigating serious crimes is, in my opinion, improper.
Even if Rosner did support his claim to have given legal advice about the existence of the tape, I would still be troubled by whether or not this would amount to a confidential communication to his attorney. Unlike the facts surrounding Tape No. 1, the facts surrounding the making and handling of Tape No. 2 give no assurance that it has remained confidential. The contents of the tape were in *83 tended for Dr. Rosen’s medical colleagues and left on his desk at the hospital. There are no facts indicating that at the time Dr. Rosen left it on his desk, he intended the contents of the tape to remain confidential or that he took any precautionary steps to insure that no one would listen to it. Indeed, it appears that by leaving it plainly visible on his desk, he intended his medical colleagues to listen to it after his suicide. Mrs. Rosen, however, intervened by telephoning her husband’s superior at the hospital, who upon discovering the cassette, returned it to her. It was at that point that Mrs. Rosen wrapped the cassette and gave it to attorney Olick, who held it until Dr. Rosen retained Rosner. Olick then returned the tape to Mrs. Rosen, who forwarded it to Rosner by giving it to his teen-aged son. Given these multiple conveyances and the initial manner in which the tape was left, I cannot agree with the majority’s conclusion (at p 77) that “[w]hen Rosner finally received the tape, he received it with its contents undisclosed.” Although it is possible that no one, as Rosner asserts, even listened to the tape, it is equally possible that any number of people, including the medical colleagues for whom it was intended, did listen to the tape.
The majority dismisses this problem by likening the cassette to a letter in a sealed envelope where those who convey it learn only of its existence while the contents remain private. I think a more appropriate analysis would be to a letter in an unsealed envelope. It is, of course, possible that no one among those passing the letter would look into the unsealed envelope and read its contents, but it is equally possible that any number of them would do so. Rosner had entered little into the record other than his own statement that his son told him he did not listen to the tape to support his contention that the tape remained confidential. Notably missing is any affidavit from the chief of surgery who initially recovered the tape from Dr. Rosen’s desk at the hospital. Significantly, neither court below addressed this question.
Even were I to subscribe to the majority’s opinion that the attorney-client privilege has been properly asserted, I would be compelled to disagree with their conclusion that *84 Tape No. 2 is protected by Dr. Rosen’s Fifth Amendment rights.
The Fifth Amendment “protects a person only against being incriminated by his own compelled testimonial communications.” (Fisher v United States, supra, at p 409.) Traditionally, this has been applied to protect a person’s private papers which reflect “a private inner sanctum of individual feeling and thought.” (Couch v United States, 409 US 322, 327, supra; Murphy v Waterfront Comm,., 378 US 52, 55.) The theory being that private thoughts, although written down or otherwise recorded, remain privileged and the government may not obtain access to those thoughts merely because the person had recorded them.
It was thus natural to extend the Fifth Amendment privilege against being compelled to testify to cover one’s private papers. (See Fisher v United States, supra, at p 420 [Brennan, J., concurring].) But just as logically, the Supreme Court has declined to extend the privilege to cover nonprivate records or information. (Bellis v United States, 417 US 85; Andresen v Maryland, 427 US 463.) By applying the Fifth Amendment to this tape recording, the majority assumes that it is a private recording of Dr. Rosen’s thoughts. Since it was concededly intended for his medical colleagues, I do not believe this would qualify as a private record. In this regard, it is analogous to business records to which others have access; those are not privileged precisely because they are not private in nature, whether or not anyone has availed himself of the opportunity to review those records. (Bellis v United States, supra, at pp 91-97.)
Assuming the Fifth Amendment does apply, I believe that, on the record before us, it is not established that Tape No. 2 is either testimonial or incriminating. At best, this court is faced with divided factual findings by the courts below. But those courts’ findings were addressed only as to whether or not the tape was relevant and material to the Grand Jury’s investigation. It is unclear, on the basis of those factual findings, whether or not the tape is incriminating. I cannot, therefore, agree with the majority’s statement that “it must be assumed that the tape’s content is self incriminatory.” (At p 78.)
*85 Nor can I agree with their statement that: “A tape cassette is clearly testimonial in that it is an aural record of the accused’s communication”. (At p 79.) This appears to assume that all cassette tapes are testimonial in nature. In light of the Supreme Court’s repeated refusal to extend the definition of what is testimonial, I find such an assumption questionable. (See Fisher v United States, supra, at p 408, citing Schmerber v California, 384 US 757 [blood samples nontestimonial]; Gilbert v California, 388 US 263 [voice exemplars nontestimonial]; United States v Wade, 388 US 218 [handwriting exemplars nontestimonial]; Holt v United States, 218 US 245 [donning blouse worn by perpetrators nontestimonial]; Bellis v United States, supra [partnership records nontestimonial].) The pronouncement in Boyd v United States (116 US 616) that the Fifth Amendment privilege is extended to private papers must be, in view of these subsequent decisions, given a limited application. (Supreme Court, 1975 Term, Fifth Amendment Protection of Private Papers, 90 Harv L Rev 76.) Thus, I think it improper to assume without a hearing on this specific question that all tapes are, or that this tape is, testimonial. Just as the giving of a voice exemplar or the taking of a blood sample was found to not be sufficiently testimonial in nature to warrant Fifth Amendment protection, it may well be that when the contents of Tape No. 2 is reviewed, it would be found to be nontestimonial' A review to determine whether or not the tape is testimonial or incriminating can, of course, be conducted by the court, in camera.
Unless it was shown at such a hearing that the tape is testimonial and incriminating, the question of whether or not its production was compelled need not be reached. If, at the hearing, it was determined that the tapes were either nontestimonial or nonincriminating, the act of producing them, even subject to a subpoena, would not involve testimonial self incrimination. “In the case of a documentary subpoena the only thing compelled is the act of producing the document and the compelled act is the same as the one performed when a chattel or document not authored by the producer is demanded.” (Fisher v United States, supra, at p 410, n 11.) The only testimonial aspect would then be that *86 turning over the tape concedes its existence. Certainly, merely admitting the existence of a common cassette tape cannot be deemed self incriminating. Whether this would constitute compelling self incriminatory testimony when the tape was heard by the Grand Jury cannot be determined until the nature of the tape is ascertained.
Because I believe that the assumptions made by the majority are improper and are not supported by the record before us, I would agree with the majority at the Appellate Division that respondent has not sustained his burden and the Grand Jury is entitled to Tape No. 2.
It is a “well settled” rule of law “that every person owes a duty to give evidence before the Grand Jury when requested to do so.” (Matter of Additional Jan. 1979 Grand Jury of Albany Supreme Ct. v Doe, 50 NY2d 14, 20 [citations omitted].) That duty is, of course, subject to limitations such as those validly raised under the Fifth Amendment. But the person resisting the subpoena has the burden of establishing that the Grand Jury is not entitled to the evidence. Unless there is such a showing, the Grand Jury’s subpoena is presumptively valid.
Given the multiple questions as to whether or not either the attorney-client privilege or the Fifth Amendment privilege applies, I do not believe that Rosner has met his burden to entitle him to quash the Grand Jury’s subpoena. I would, therefore, affirm the Appellate Division as to Tape No. 2.
Judges Jones, Wachtler, Fuchsberg and Meyer concur with Chief Judge Cooke; Judge Jasen concurs in part and dissents in part and votes to modify in a separate opinion; Judge Gabrielli taking no part.
Order modified, without costs, and matter remitted to Supreme Court, Bronx County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.