**INTERSTATE COMMERCE COMMISSION, Appellee,**

**v.**

**James R. GOULD, doing business as Brokers for Agricultural Cooperative Associations, Appellant.**

No. 79–2556.

United States Court of Appeals, Third Circuit.

Argued March 25, 1980.

Decided June 30, 1980.

Edward J. Schwabenland, Asst. U. S. Atty., Robert J. Cindrich, U. S. Atty., Pittsburgh, Pa., M. Faith Angell (argued), Regional Counsel, Bureau of Investigations and Enforcement, I.C.C., Philadelphia, Pa., Peter M. Shannon, Jr., Director, Bureau of Investigations and Enforcement, I.C.C., Washington, D. C., for appellee.

Donald J. Willy (argued), Donald J. Willy & Associates, Sewickley, Pa., for appellant.

Before ROSENN, GARTH and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This is an appeal from an order of the district court which granted summary judgment in favor of the Interstate Commerce Commission (ICC) on its petition to require James Gould to allow ICC agents access to his business records. We conclude that the ICC possesses statutory authority to examine Gould's records. Nevertheless, Gould has raised a substantial question regarding the protection afforded him by the fifth amendment, and we therefore remand this case to the district court for further proceedings.

### I.

Gould does business in the form of a sole proprietorship, Brokers for Agricultural Cooperative Associations (BACA). ICC agents visited the BACA office on October

5, 1977 and, pursuant to section 220(d) of the Interstate Commerce Act (ICA), 49 U.S. C.A. § 11144(b) (West Supp.1980),[1] demanded to inspect BACA's transportation-related records. Gould refused to comply with the agents' request. After further communications, the ICC on a number of occasions again requested access to BACA's records. These requests were made pursuant to section 11144(b), as well as ICA § 220(g), 49 U.S.C.A. § 11144(c) (West Supp.1980).[2] Gould consistently refused to permit access to his records.

The ICC then filed an action in the District Court for the District of Western Pennsylvania. This action sought an injunction which would compel Gould to grant the ICC access to BACA's records. The court's jurisdiction was invoked pursuant to ICA §§ 204(a)(6), 220(d), 222(b)(1), 49 U.S.C.A. §§ 10321(c)(3), 11144(b), 11702 (a)(4) (West Supp.1980).[3] In his submissions, Gould admitted to doing business as BACA, App. at 15 (answer); that he believed that the ICC was investigating him, *id.* at 15–16; that the ICC had requested access to his records a number of times, *id.* at 16; and that he had refused to comply with those requests, *id.* at 17. He also admitted paragraphs 4 and 5 of the ICC complaint, which state:

4. Pursuant to this investigation, on or about October 5, 1977, Agents Martin P. Monaghan, Jr., and John Sopko, duly authorized agents of the Commission, appeared at the defendant's place of business and, after proper display of credentials, made a formal oral demand for access to those transportation-related records and documents maintained by the defendant in the course of his interstate transportation operations under the name of BACA. Said demand was refused by the defendant, James R. Gould.

5. Defendant was re-contacted by Agent Monaghan, on or about October 6, 1977, and at this time Agent Monaghan again requested access to the transportation-related records and documents main-

---

**1.** Section 11144(b) provides:

The Commission, or an employee designated by the Commission, may on demand and display of proper credentials—

(1) inspect and examine the lands, buildings, and equipment of a carrier, broker, or lessor; and

(2) inspect and copy any record of—

(A) a carrier, broker, lessor, or association;

(B) a person controlling, controlled by, or under common control with a carrier if the Commission considers inspection relevant to that person's relation to, or transaction with, that carrier; and

(C) a person furnishing cars or protective service against heat or cold to or for a rail or express carrier if the Commission prescribed the form of that record.

Statutory citation in this area has been considerably complicated by the recent complete revision, recodification, and reenactment of the Interstate Commerce Act, Act of Oct. 17, 1978, Pub.L. No. 95-473, 92 Stat. 1337 (1978). In the interest of conforming to the congressional intent seeking to streamline the language and structure of the Act, we will cite statutory provisions to their new section numbers in the United States Code Annotated, since the new codification has not yet appeared in the United States Code. For the sake of convenience, a table of approximate cross-references is included as an appendix to this opinion.

**2.** Section 11144(c) provides:

The Commission, or an employee designated by the Commission, may, during normal business hours, inspect and copy any record related to motor vehicle transportation of a cooperative association or federation of cooperative associations required to notify the Commission under section 10526(a)(5) of this title. However, the Commission may not prescribe the form of records to be maintained by a cooperative association or federation of cooperative associations.

The request under this section was predicated upon BACA's serving as an agent for Harvest Moon Farm Lines, Inc., an agricultural cooperative registered with the ICC. Gould advised the ICC that his agency relationship had been terminated and that he had not retained any records pertaining to Harvest Moon. The ICC did not press this request, and it is not a subject of this appeal.

**3.** 49 U.S.C.A. § 10321 (West Supp.1980) specifies generally the powers of the ICC, and includes the power to conduct far-reaching investigations and to subpoena witnesses and records. *Id.* § 10321(c)(1). Subsection (c)(3) gives the district courts the power to enforce such subpoenas.

Section 11702(a)(4) gives the ICC the authority to bring a civil action, *inter alia*, to enforce any provision of the ICA except provisions "governing the reasonableness and discriminatory character of rates."

tained by the defendant. Said demand was once again refused by the defendant, James R. Gould.

*Id.* at 6.

In his answer, Gould also raised as separate defenses the ICC's lack of jurisdiction over BACA, that the ICC's request for records was made in bad faith,[4] and that the records were shielded from ICC view by the fourth and fifth amendments.[5] The ICC moved for summary judgment, which was granted.[6]

The issues presented in this appeal fall into three broad categories: first, whether the ICC has jurisdiction to conduct its investigation and thus obtain inspection of Gould's papers; second, whether the ICC has followed the procedures required by statute and case law; and, third, whether the Constitution nevertheless shields Gould's records from disclosure. It is to the first category which we now turn.

## II.

The dispute over the ICC's statutory jurisdiction under section 11144(b) to "inspect and copy any record of a . . . broker" poses the question as to whether the ICC has jurisdiction to determine its own jurisdiction. Gould contends that he and BACA are exempt from ICC regulation and has denied that BACA's operations are in any way subject to ICC jurisdiction. Gould argues that section 11144(b) applies only where a business has consented to ICC regulation or has been adjudicated to be subject to ICC jurisdiction. Gould maintains that the ICC may investigate BACA's activities only by resorting to the more cumbersome procedures of ICA §§ 204, 205, 49 U.S.C.A. § 10321 (West Supp.1980). Section 10321 extends the ICC's investigative power to anyone who has information relevant to a transportation-related inquiry, *see Comet Electronics, Inc. v. United States*, 381 F.Supp. 1233, 1237–40 (W.D.Mo.1974), *aff'd mem.*, 420 U.S. 999, 95 S.Ct. 1439, 43 L.Ed.2d 758 (1975); note 3 *supra*.[7]

The ICC, on the other hand, argues that the section 10321 general investigatory power and the section 11144(b) inspection power are equally available alternatives where the person or entity the ICC seeks to inspect arguably falls within ICC jurisdiction. The ICC points out that it must first inspect Gould's BACA records to determine whether or not Gould has subjected himself to ICC jurisdiction either by the nature of his business or by his business dealings:

> The purpose of the Commission's inquiry is to determine whether or not the defendant is subject to the provisions of the Interstate Commerce Act, and if so, whether the defendant is in violation of any of the provisions thereof.

App. at 170 (answer to interrogatory).

We find the ICC's argument persuasive. Section 10321 explicitly states, "Enumeration of a power of the Commission in this subtitle does not exclude another power the Commission may have in carrying out this subtitle." This disclaimer belies Gould's claim that section 10321 is in any way exclusive. Moreover, the cases that have examined analogous issues of jurisdiction of

---

**4.** This includes Gould's claims that the ICC wanted the records for an improper purpose, that the ICC had failed to follow the necessary administrative steps, and that the ICC request was too indefinite.

**5.** Other defenses included assertions that the ICC had other means of obtaining the information, that other parties would have to be joined to have their rights protected, and that the inspection would be unduly burdensome to Gould.

**6.** On April 12, 1979, after additional time had been accorded Gould for further discovery, the district court entered summary judgment in favor of the ICC permanently enjoining Gould from refusing to produce BACA's records. Following additional motions made by Gould, which resulted in rehearing, the district court entered its order dated September 7, 1979, which was filed on September 11, 1979 and which affirmed its earlier disposition. Hereafter this order will be referred to as the September 11, 1979 order. Thereafter the district court stayed the operation of its order pending disposition on appeal.

**7.** Under § 10321, there is no provision for summary enforcement, and subpoenas that are issued must be authorized only by certain ICC officials.

other agencies have consistently accorded broad latitude to the agencies' powers, including "jurisdiction to determine jurisdiction" by summary procedures.

First, it is clear that regulatory agencies may inspect records on summary proceedings without any showing of probable cause. *See, e. g. United States v. Powell*, 379 U.S. 48, 53–54, 85 S.Ct. 248, 253, 13 L.Ed.2d 112 (1964) (Internal Revenue Service). All that is necessary is that the "information sought [be] reasonably relevant," *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950) (Federal Trade Commission).

Second, the Supreme Court held in *Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), that under the Fair Labor Standards Act provision giving the Secretary of Labor the authority to subpoena records summarily, 29 U.S.C. § 209, it was for the Secretary, in the first instance, to determine, by inspecting the records if necessary, whether the particular business was covered by the Act. *See* 327 U.S. at 209–14, 66 S.Ct. at 505–08. The Court distinguished those situations requiring probable cause, as in the case of a warrant, from situations, like the one presented there, where the investigation was "for a lawfully authorized purpose, within the power of Congress to command," *id.* at 209, 66 S.Ct. at 505, and where "the documents sought are relevant to the [agency's] inquiry," *id.* It was in this context that the Court defined the Administrator's subpoena power and the right of summary enforcement. The Court said:

> We think, therefore, that the courts of appeals were correct in the view that Congress has authorized the Administrator, rather than the district courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations; in doing so to exercise his subpoena power for securing evidence on that question, by seeking the production of petitioner's relevant books, records and papers; and, in case of refusal to obey his subpoena, issued according to the statute's authorization, to have the aid of the district courts in enforcing it.

*Id.* at 214, 66 S.Ct. at 508, *see Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 507–09, 63 S.Ct. 339, 342–43, 87 L.Ed. 424 (1943) (Walsh-Healey Public Contracts Act, 41 U.S.C. §§ 35–45). The courts of appeals have followed the same analysis in construing the subpoena power [8] of other agencies. In *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047 (2d Cir. 1973), *cert. denied*, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974), the Second Circuit wrote:

> Appellants argue, therefore, that before the Commission can subpoena information from them, the Commission must demonstrate that there is "reasonable, factual cause for a belief that the sales made by these three [appellants] may constitute the sale of 'securities' or 'investment contracts' within the meaning of Section 2(1) of the Securities Act." In particular, they urge that the district court must make some initial determination as to statutory coverage and that the fourth amendment's "probable cause" requirement demands that the Commission show enough facts to demonstrate that "reasonable grounds" exist for issuing subpoenas to appellants and compelling the production of documents.

> Appellants raise serious questions about whether their activities are subject to regulation by the SEC. Should the Commission seek to exercise regulatory control over appellants' business affairs at some future date, whether by means of a section 5 injunctive suit or otherwise, appellants will be entitled to a full hearing on their contentions. However, it has long been settled that such issues are not to be decided in subpoena enforcement actions. *The Commission must be free without undue interference or delay to*

---

**8.** The subpoenas to which we refer in the cases cited in text are the equivalent of the ICC's statutory power under § 11144(b) to inspect records where there is a legitimate and relevant subject of inquiry. *See Midwest Growers Co-op. Corp. v. Kirkemo*, 533 F.2d 455, 461 (9th Cir. 1976).

*conduct an investigation which will adequately develop a factual basis for a determination as to whether particular activities come within the Commission's regulatory authority.*

In 1946 in *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), a case involving the administration of the Fair Labor Standards Act, 52 Stat. 1060, the Supreme Court stated what has since become the rule for interpreting regulatory statutes; namely, that *it is for the agency rather than the district courts to determine in the first instance the question of coverage in the course of the preliminary investigation into possible violations.* 327 U.S. at 214, 66 S.Ct. at 508. See *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943).

480 F.2d at 1052–53 (footnotes omitted) (emphasis supplied); [9] *accord, SEC v. Howatt*, 525 F.2d 226, 229–30 (1st Cir. 1975); *SEC v. Savage*, 513 F.2d 188, 189 (7th Cir. 1975) (per curiam). The same result obtains with respect to the Federal Trade Commission's subpoenas. In *FTC v. Texaco, Inc.*, 555 F.2d 862 (D.C.Cir.) (en banc), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977), the District of Columbia Circuit wrote:

> As a general rule, substantive issues which may be raised in defense against an administrative complaint are premature in an enforcement proceeding. The controlling case again is *Endicott Johnson*, where the Court stated that the petitioner has "advanced many matters that are entitled to hearing and consideration in its defense against the administrative complaint, but they are not of a kind that can be accepted as a defense against the subpoena." 317 U.S. at 509, 63 S.Ct. at 343 (footnote omitted). Moreover, in holding that an administrative subpoena must be enforced if the information is relevant to a lawful purpose of the agency, and not unduly indefinite or unreasonably burdensome, the Supreme Court has

clearly rejected other defenses. The reasons for this rule are obvious. If parties under investigation could contest substantive issues in an enforcement proceeding, when the agency lacks the information to establish its case, administrative investigations would be foreclosed or at least substantially delayed. As the Court stated in *Oklahoma Press*,

> [P]etitioners' view, if accepted, would stop much if not all of investigation in the public interest at the threshold of inquiry and, in the case of the Administrator, is designed avowedly to do so. This would render substantially impossible his effective discharge of the duties of investigation and enforcement which Congress has placed upon him. 327 U.S. at 213, 66 S.Ct. at 508.

No substantive rights are negated by the restriction, for if a formal complaint is issued, subpoenaed parties may assert their defenses in the subsequent administrative proceeding. Further, the agency's final decision in that adjudicatory proceeding is reviewable by a court of appeals.

These principles have consistently been applied when jurisdictional defenses have been raised in enforcement proceedings. Two recent cases are illustrative. In *FMC v. Port of Seattle*, the Ninth Circuit held that the district court erred in limiting enforcement of Maritime Commission discovery orders to only those facts necessary to determine the Commission's jurisdiction to investigate the Port's consolidation services and in refusing to permit the Commission to inquire into the "details" of the consolidation services. 521 F.2d 431, 433–436 (1975). Similarly, the Seventh Circuit held in *SEC v. Savage* that the Commission was not required to establish its jurisdiction by demonstrating that a company's commodities future contracts were "securities" within the meaning of the Securities Act before the subpoena would be enforced. 513 F.2d 188, 189 (1975). The court emphasized that

---

9. *See* 480 F.2d at 1053–54 (historical background); *id.* at 1055 (SEC "is entitled to conduct a full inquiry into both potential coverage and potential violations").

the company "would require SEC to answer at the outset of its investigation the possibly doubtful questions of fact and law that the investigation is designed and authorized to illuminate." Id. 555 F.2d at 879 (footnotes omitted); *accord, FTC v. Swanson*, 560 F.2d 1, 1–2 (1st Cir. 1977) (per curiam) (inappropriate, in subpoena enforcement proceeding, to litigate question of whether there could possibly be a legitimate purpose to subpoena if, as target claimed, it was beyond FTC jurisdiction); *FTC v. Gibson*, 460 F.2d 605, 608 (5th Cir. 1972).

■ Although the agencies' governing statutes construed in these cases necessarily differ in some respects from the Interstate Commerce Act, we do not find that any such differences dictate a dissimilar result in the present case. The ICC's summary inspection authority, first granted in 1935 when jurisdiction of the ICC was established over the trucking industry,[10] is the analogue of the authority granted to other agencies to issue subpoenas enforceable by court order. *Midwest Growers Co-op. Corp. v. Kirkemo*, 533 F.2d 455, 461 (9th Cir. 1976).[11] In every situation, the issue of the agency's jurisdiction and the answer are the same. As long as the agency arguably has jurisdiction to inspect, questions of jurisdiction—such as whether the business was in fact engaged in interstate commerce, or whether the documents traded were "securities," or whether the business has engaged in regulated transportation activities—are to be determined in the first instance by summary inspection procedures and need not be first litigated in court.[12]

■ An examination of the record of this case reveals that at no time did Gould ever deny that he had transportation-related records. Far from denying possession of records or denying that his business was not involved in transportation of agricultural commodities, Gould in his brief at 2 described his business as "a sole proprietorship engaged in the business of brokering transportation services for carriers exempt from the jurisdiction of the Interstate Commerce Commission," but claimed that he was exempt from ICC regulation.[13] Rather, his consistent position has been that he has refused to provide any such transportation-related records and documents to the ICC even though negotiations looking toward access to the records by the ICC have been conducted. In this posture of the record, and giving credit to the argument made by Gould *not* that he had no such records, but rather that the ICC should obtain them elsewhere or by use of different procedures, it is apparent that the ICC has ample justification to believe that Gould and BACA have engaged in a transportation-related business, whose activities might arguably fall within the ICC's jurisdiction. We therefore hold that the ICC had statutory jurisdiction to inspect Gould's BACA records through the summary provisions of

---

**10.** Motor Carrier Act, 1935, ch. 498, 49 Stat. 543, 563 (1936).

**11.** We note that when Congress extended the ICC's inspection power to the records of agricultural cooperatives, it neglected to include agricultural cooperatives as parties against whom the ICC could secure injunctions to enforce inspection requests, even though it included agricultural cooperatives as parties whose records could be inspected. Nor was this omission corrected by § 11702(a)(4) in the 1978 reenactment of the ICA, *see* notes 1 & 3 *supra*. Nevertheless, we agree with those courts that have held that the omission was an oversight and that a court of equity in any event has inherent power to enforce by injunctive order the ICC's "right" to inspect the records, lest the ICC be left with a right without a remedy. *ICC v. Beehive State Agricultural*

*Coop., Inc.*, 575 F.2d 802, 804 (10th Cir. 1978); *Midwest Growers*, 533 F.2d at 461; *ICC v. Big Valley Growers Co-op*, 493 F.2d 888, 891 (9th Cir. 1974).

This issue is not presented directly in this appeal because Gould has challenged the ICC's very right to inspect, not its right to obtain an injunction to enforce its inspection. Moreover, this record does not disclose whether in fact BACA is an agricultural cooperative.

**12.** *See generally*, 1 K.C. Davis, Administrative Law Treatise § 4:6 (2d ed. 1978).

**13.** We need not discuss, and thus reserve, the situation where an individual or business denies possession of the records sought, inasmuch as that issue is not presented by this record.

section 11144(b) and to seek an injunction to compel Gould to permit the inspection.

## III.

### A.

■ The next issue which we must examine is whether the ICC has conformed to the procedures established by statute and case law. As we understand Gould's contention, it is that even if a right of summary inspection is authorized by law, the agents who visited Gould did not comply with mandated procedures so as to permit enforcement. We cannot agree.

The record reveals that at least as to the visit on October 5, 1977, the ICC agents complied with the express procedural requirements of section 11144(b). Paragraph 4 of the ICC's verified complaint states:

Pursuant to this investigation, on or about October 5, 1977, Agents Martin P. Monaghan, Jr., and John Sopko, duly authorized agents of the Commission, appeared at the defendant's place of business and, after proper display of credentials, made a formal oral demand for access to those transportation-related records and documents maintained by the defendant in the course of his interstate transportation operations under the name of BACA. Said demand was refused by the defendant, James R. Gould.

App. at 6. Gould admitted these allegations in his verified answer, *id.* at 16. Thereafter he filed an affidavit in which he reaffirmed the statements contained in his verified answer, *id.* at 109.[14] While subsequent actions of the agents, the ICC, and Gould are interpreted differently by the parties as they pertain to the ICC's demand and "negotiation" for records, there is, as we have pointed out, no material factual dispute with respect to the actions of the

agents on the October 5, 1977 visit. Thus, Gould's claim that the agents violated the procedural requirements of section 11144(b) must fail.

### B.

Another aspect of Gould's argument in which he contends that the ICC did not comply with appropriate procedures, is his allegation that the ICC has an improper purpose in seeking to inspect his records. Gould argues that the ICC is attempting to gather information for a criminal investigation and that such a purpose is illegal and cannot support the inspection sought.

### 1.

The ICC's power to inspect records under the authority of section 11144(b) is limited by the same standards of "reasonableness" as apply to other agencies' subpoena power. *See Midwest,* 533 F.2d at 461; *Cooper's Express, Inc. v. ICC,* 330 F.2d 338, 341 (1st Cir. 1964). *Cooper's* stated:

The statute in question [the predecessor of section 11144(b)] grants the Commission a broad power of inspection commensurate with its broad power of regulation of carriers engaged in interstate commerce. It could not properly perform its duties if the regulated party had the right to say just how far an examination could go. . . . The Commission itself is limited by the standard of reasonableness. The inspection must be related to the Commission's function as a regulator of motor carriers in interstate commerce. Of course "[i]n view of the broad power of regulation of interstate public carriers, it is difficult to conceive of a case in which the Interstate Commerce Commission would be seeking to inspect a record or document which would not be relevant to a lawful activity of the Commission. We assume, however, that if such a case were presented, the right to

14. We are puzzled by the position taken in Gould's brief, which apparently contradicts the admission made by Gould's answer and in his affidavit, to which we have referred in text above. Gould's brief at 15 states that the facts contained in findings 5, 6, and 7 of district court, App. at 79, are controverted by the parties. Yet, the district court's findings 5, 6, and

7 do no more than summarize the allegations of paragraph 4 of the ICC's complaint, which allegations were admitted by Gould. While findings of fact are obviously not compatible with a summary judgment disposition, *see* note 24 *infra,* it nevertheless appears that Gould's brief does not accurately represent Gould's sworn admissions.

require production of a record or document would be denied."

*Id.* (citations omitted).

Subsequent developments, however, have further delimited the meaning of "reasonableness." In the context of Internal Revenue Service summonses, the Supreme Court has held that the Service has the initial burden of proving a *prima facie* case of "good faith." *United States v. LaSalle National Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1977); *United States v. Powell, supra.* We have recently explained this requirement and its attendant procedures in *United States v. Garden State National Bank,* 607 F.2d 61 (3d Cir. 1979):

LaSalle defined "good faith" in this context both affirmatively and negatively. In its affirmative definition, *LaSalle* referred to the four prongs of the *prima facie* showing of "good faith" as explicated in *United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964), namely:

(1) that the investigation is being conducted for a legitimate purpose (*i. e.,* that the I.R.S. retains an interest in civil tax collection);

(2) that the material sought is relevant to the legitimate purpose of the investigation;

(3) that the information is not yet in the possession of the I.R.S.; and

(4) that the proper administrative steps have been followed.

It is the Government's burden to satisfy all four prongs of the *Powell* test. *Id.* at 57, 85 S.Ct. 248 [at 254]. The requisite showing is generally made by affidavit of the agent who issued the summons and who is seeking enforcement. *United States v. McCarthy,* 514 F.2d 368, 372 (3d Cir. 1975). "[T]he purpose of the good-faith inquiry is to determine whether the agency is honestly pursuing the goals of [I.R.C.] § 7602 by issuing the summons." *LaSalle,* 437 U.S. at 316, 98 S.Ct. at 2367.

Those goals may be summarized as (1) ascertaining the correctness of a return, (2) making a return where none has been made, (3) determining tax liability, and (4) collecting taxes. *LaSalle* cautions that the I.R.S. "at all times must use the summons authority in good-faith pursuit of [these] congressionally authorized purposes," *id.* at 318, 98 S.Ct. at 2368.

607 F.2d at 67–68; *see United States v. First National State Bank,* 616 F.2d 668, 670–73 (3d Cir. 1980).

The Supreme Court, in establishing the *LaSalle* guidelines, addressed the concerns of Congress in preventing and prosecuting tax fraud. It was in that context that the Supreme Court drew the line between civil tax collection processes and criminal tax proceedings insofar as powers of the Internal Revenue Service were concerned. Thus, the Internal Revenue Service is entitled to use its summons power and to obtain judicial enforcement of its summonses in order to pursue the civil aspects of tax collection. However, it is an abuse of this power to use it solely to gather evidence for a *criminal* tax fraud prosecution, as such prosecutions are within the purview of the Justice Department and the grand jury—not the Internal Revenue Service.

■ It appears to us that the congressional approach to the regulation of commerce is similarly structured. The ICA provides that the ICC may bring only civil actions, while the Justice Department may bring criminal prosecutions as well. *Compare* 49 U.S.C.A. § 11702 (West Supp.1980) (civil actions) *with id.* § 11703 (criminal and derivative civil proceedings).[15] To enforce an ICC inspection request made solely in order to gather evidence for a criminal prosecution would be as much of an abuse of judicial process under the ICA as it would be if a tax investigation did not qualify under the *LaSalle-Garden State* principles. We therefore hold that in order to obtain an injunction under section

---

**15.** The Inspector General Act of 1978, Pub.L. No.95 452, 92 Stat. 1101 (1978) (codified at 5 U.S.C.A. app. I (West Supp.1980)), created inspectors general in a number of executive agencies, including the Departments of Commerce and Transportation. This Act is not implicated on this appeal.

11702(a)(4) to enforce a section 11144(b) inspection request, the ICC, in addition to meeting the procedural requirements of section 11144(b), must also satisfy the tests of *Powell, LaSalle,* and *Garden State.*[16]

## 2.

■ We recognize that the ICC was not required by the district court to submit *Powell* affidavits. However, the ICC did answer Gould's interrogatories under oath, Fed.R.Civ.P. 33, and its sworn answers clearly reveal that the four-pronged *Powell* test has been met. The answers demonstrate the following:

(1) The purpose of the ICC inquiry is to determine whether or not Gould is subject to the ICA and if so, whether he violated it. App. at 170.

(2) The inquiry began in September 1977. *Id.*

(3) The necessary records are:
BACA invoices or freight bills, receipts or bills of lading, record of payment by shippers, record of payment to underlying truck owner or lessee, equipment leases, dispatch records, records of any inquiries to agricultural cooperatives regarding their legitimacy, written agreements between the defendant and the agricultural cooperatives.
*Id.* at 173.

(4) These records are relevant to the inquiry:
in that they will allow the Commission to determine whether or not the activities of the defendant are subject to the jurisdiction of this Commission, and if so, whether or not the defendant has violated any of the provisions of the Interstate Commerce Act or related statutes.
*Id.*

(5) Request was personally made for these records by two agents on October 5, 1977 and not complied with.
*Id.*

As to the records listed in number (3) above, therefore, the ICC has satisfied the *Powell* test as well as the test of section 11144(b), discussed in Part (III)(A) *supra.*[17]

## 3.

We turn now to Gould's more specific objection that the ICC was using its inspection power to gather evidence solely for a criminal investigation. The only support Gould has adduced for this charge is as follows:

(1) The ICC began negotiating with Gould for disclosure but then stopped negotiating and filed the injunctive action.

(2) The ICC agents commented that many or most agricultural cooperatives are illegal. App. at 111.

(3) An affidavit of one Roger Milliron stated that ICC agents admitted to Milliron that they were investigating Gould for criminal violations and transportation without ICC authority. *Id.* at 116.

(4) The ICC requested Gould's records with respect to the Harvest Moon Cooperative but failed to pursue the matter further. *Id.*

We have held that criminal purpose may not in any way be demonstrated by an agency's negotiation posture. *First National State,* 616 F.2d at 673; *Garden State,* 607 F.2d at 66 n. 7. Nor are the statements or

---

**16.** *See generally Developments in the Law— Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions,* 92 Harv.L.Rev. 1227, 1329-30 (1979) [hereinafter cited as *Developments* ] (suggesting application of *LaSalle* to all agencies); Note, *The Institutional Bad Faith Defense to the Enforcement of IRS Summonses,* 80 Colum.L.Rev. 621, 625 n. 29 (1980) (noting applicability of *LaSalle* to Securities and Exchange Commission and to National Labor Relations Board but suggesting that *LaSalle* should not apply where an agency's summons power contemplates criminal investigations).

**17.** Although the ICC also stated that the inquiry was authorized by 49 U.S.C. § 304(a)(6) (now codified as § 10321(a) (b)), App. at 170, the failure to cite § 11144(b) is not fatal, since *Powell* does not require explicit citation of the statutory basis for the inspection. It is clear from the other answers to the interrogatories and from the facts of the case that the inspection request was properly authorized under § 11144(b).

beliefs of mere agents relevant. *LaSalle,* 437 U.S. at 316, 98 S.Ct. at 2367; *First National State,* 616 F.2d at 673; *Garden State,* 607 F.2d at 73. Moreover, the fact that there may be a simultaneous criminal investigation will not negate the existence of a civil purpose. *First National State,* 616 F.2d at 672; *Garden State,* 607 F.2d at 74 & n. 19. Finally, we can perceive no relevance whatsoever in the fact the ICC dropped its request for the Harvest Moon records.

#### 4.

Accordingly, we conclude that the ICC has satisfied its burden of proof of a *prima facie* case of "good faith," and Gould has not demonstrated any bad faith in the ICC's purpose or any lack of compliance with procedural requirements.

#### C.

■ Nor is there merit to Gould's argument that the ICC's inspection request was too indefinite. The ICC did not know exactly what records Gould had. It requested "transportation-related records maintained by Gould in the course of his interstate transportation operations," App. at 101 (agent's affidavit), as further delineated by the ICC's answers to Gould's interrogatories, *see id.* at 173, *quoted supra.* Such a request is sufficiently specific to support enforcement under section 11144(b). *See Cooper's,* 330 F.2d at 341 (ICC "could not properly perform its duties if the regulated

· party had the right to say just how far an examination could go").[18]

#### IV.

The final and most troublesome issue presented by this appeal is Gould's claim that the fifth amendment shields the records sought by the ICC. On the record as it now stands, it is undisputed that BACA is a sole proprietorship and that Gould is the sole proprietor of BACA. Insofar as this record reveals, Gould is the sole owner of the records the ICC wishes to inspect, and these records are in Gould's exclusive possession. Gould insists as well that his personal records are inextricably entwined and intermingled with BACA's business records.

In the case of *In re Grand Jury Empanelled February 14, 1978 (Colucci),* 597 F.2d 851, 859–66 (3d Cir. 1979), we had occasion to review and distill the relevant fifth amendment precedents. We held in *Colucci* that a sole proprietor may not quash a grand jury subpoena for business records not in his possession.[19] In the present case we face a question not decided in *Colucci, see id.* at 860: may a sole proprietor deny a business records visitation inspection which is analogous in all respects to a business records subpoena addressed to *him*?[20] The present proceeding, however, requires answers to two secondary questions.

First, while recognizing that for other purposes (questions of jurisdiction and reasonableness, *see* Parts (II), (III) *supra*) the

---

**18.** The *Cooper's* court affirmed a preliminary injunction ordering the business:

to submit all its accounts, books, records, memoranda, correspondence and other documents for inspection and copying, and submit all its lands, buildings and equipment for examination and inspection by duly authorized representatives of the Interstate Commerce Commission upon demand and display of proper credentials; and to desist from secreting, concealing, or destroying any accounts, books, records, memoranda, correspondence or other documents except as permitted by law.

330 F.2d at 340.

As a final matter, we note that Gould's defenses that the ICC had other possible sources for the information, that other parties should be joined, and that allowing inspection in this

case would burden Gould's business unduly have no basis in either law or fact in resisting an enforcement proceeding under § 11702(a)(4).

**19.** The records in *Colucci* were physically in an employee's possession. We held, *inter alia,* that the employer could not claim constructive possession where the employee had prepared and maintained the records, the employee had access to them, they were business and not personal papers, and that consequently there could be no expectation of privacy.

**20.** There was no need to reach this issue in *Colucci,* since once the Government could obtain the same records from the employee, it had no more interest in obtaining the selfsame records from the employer-proprietor himself.

ICC inspection procedure is analogous to the subpoena-summons procedures of other agencies where summary enforcement is provided, the first question that must be addressed is whether, in a fifth amendment context, the same analogy obtains. Or, is the inspection procedure of the ICC more analogous to a search and seizure, rather than the subpoena–summons procedure? As we shall discuss, the answer to this question must be furnished by the district court after an appropriate record has been developed.

Second, may Gould, rather than making a specific objection to the production of any particular document, assert a blanket fifth amendment defense to the production of all documents? We hold that he may not.

### A.

It is a commonly held belief that the modern businessman has little or no expectation of privacy in his business records, especially those documents prepared in compliance with regulatory requirements. Commentators have consequently urged that fifth amendment protection be denied generally to business records. *See, e. g.*, 1 K. C. Davis, *supra*, § 4:17, at 279; *Developments, supra* note 12, at 1286. Nevertheless, the governing law with respect to the fifth amendment protection afforded business records remains as it was succinctly restated in *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974):

It has long been established, of course, that the Fifth Amendment privilege against compulsory self-incrimination protects an individual from compelled production of his personal papers and effects as well as compelled oral testimony. In *Boyd v. United States*, 116 U.S. 616 [, 6 S.Ct. 524, 29 L.Ed. 746] (1886), we held that "any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to

convict him of crime" would violate the Fifth Amendment privilege. *Id.*, at 630 [, 6 S.Ct. at 532]; see also *id.*, at 633–635 [, 6 S.Ct. at 533–34]; *Wilson v. United States*, 221 U.S. 361, 377 [, 31 S.Ct. 538, 543, 55 L.Ed. 771] (1911). The privilege applies to the business records of the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life. *Boyd v. United States, supra; Couch v. United States*, 409 U.S. 322 [, 93 S.Ct. 611, 34 L.Ed.2d 548] (1973); *Hill v. Philpott*, 445 F.2d 144 (CA7), cert. denied, 404 U.S. 991 [, 92 S.Ct. 533, 30 L.Ed.2d 542] (1971); *Stuart v. United States*, 416 F.2d 459, 462 (CA5 1969). As the Court explained in *United States v. White*, [322 U.S. 694, 698 (, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542) (1944)], "[t]he constitutional privilege against self-incrimination . . . is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him." *See also Curcio v. United States*, 354 U.S. 118, 125 [, 77 S.Ct. 1145, 1150, 1 L.Ed.2d 1225] (1957); *Couch v. United States, supra*, [409 U.S.] at 330–331 [, 93 S.Ct. at 617].

417 U.S. at 87–88, 94 S.Ct. at 2182.

To be sure, the sweeping rule of *Boyd* has not survived the test of the time entirely unscathed. *Bellis* itself, for example, noted that "an individual cannot rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally," *id.* at 88, 94 S.Ct. at 2183. *See generally id.* at 88–101, 94 S.Ct. at 2182–2189 (discussing historical development of exclusion from fifth amendment coverage of business papers of organized institutional activity).[21]

---

**21.** *Bellis* noted that landmark cases in this line include *Wilson* (corporate officer may not claim privilege with respect to corporate books); *Wheeler v. United States*, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309 (1913) (same where corporation has been dissolved); *Grant v. Unit-* *ed States*, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423 (1913) (same where corporation had been dissolved, even if records were in possession of sole shareholder); *White* (privilege inapplicable to records of unincorporated association); and *Bellis* itself (same with respect to partnership,

Yet, where the records are not those of a collective entity, and are not held in a representative capacity, but are rather records of an individual proprietorship not separate or distinct from the sole proprietor, as Gould claims his records are here, then neither *Bellis* nor any case to date [22] holds that such records are without the individual proprietor's fifth amendment privilege.

### B.

Thus, the question which we must now answer is whether, for fifth amendment purposes, the ICC inspection procedure resembles the subpoena-summons procedures of other agencies on the one hand or search and seizure procedures on the other. The answer to this question dictates

whether Gould may claim the protection of the fifth amendment for his papers and records. As we have just indicated, under *Bellis* the fifth amendment may be asserted by a sole proprietor to shield the business records of his sole proprietorship, where there is no organized institutional activity. By contrast, the Supreme Court has held, in *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), that the fifth amendment affords no protection whatsoever against the search and seizure of business records. *See* note 22 *supra*.

As we have discussed in Parts (II) and (III) *supra*, with respect to questions of jurisdiction and reasonableness, the procedures employed by the ICC under section

even where partnership has been dissolved). *See In re Witness Before the Grand Jury (Marlin)*, 546 F.2d 825, 827 (9th Cir. 1977) (same with respect to records of sole proprietorship that "were maintained by appellant's business and accounting staff in the same manner as the various joint venture accounts").

Although many of these cases rely on the absence of an expectation of privacy, this notion has always been related not to the business nature of the records but rather to the institutional character of the type of business organization involved. It is organized institutional activity, as distinct in nature from the sole proprietorship, that forfeits an expectation of privacy.

22. *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), allowed the Government to compel production of an *accountant's* workpapers—clearly business records—from the hands of the taxpayer or his attorney. *Fisher* explicitly left open one question:

> Whether the Fifth Amendment would shield the taxpayer from producing his own tax records in his possession is a question not involved here; for the papers demanded here are not his "private papers". . . .

*Id.* at 414, 96 S.Ct. at 1582, (citation omitted). Technically, the reason for requiring production in *Fisher* was that the papers requested were not prepared by the party involved; so he "could not vouch for their accuracy. The documents could not be admissible in evidence against the taxpayer without authenticating testimony." *Id.* at 413, 96 S.Ct. at 1582. What the taxpayer in *Fisher* was doing—producing papers prepared by someone else—was not "testimonial" and hence did not merit fifth amendment protection. In *Colucci* we recognized this distinction as well when we held that if a sole proprietor had wrongfully usurped

actual possession of records after his rights were frozen by service of a subpoena, the records could be seized from him because the testimonial authentication could be obtained from the employee who had had the records before. 597 F.2d at 865 66.

Just as *Fisher* allowed compulsion of action so long as the action was not "testimonial," in *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), the Court allowed a *seizure* pursuant to search warrant of incriminating business records, since the individual whose premises were searched was neither required to aid in the production of the records nor compelled to authenticate them. *Fisher* and *Andresen* have been viewed as illustrative of a shift over the past century from the formalist-absolutist approach of *Boyd* toward a more pragmatic and relativist vision of the fifth amendment, focusing on the manner and procedure by which evidence is obtained. Note, *Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments*, 90 Harv.L.Rev. 945, 946-47, 975 - 78 (1977).

Yet, while *Fisher, Andresen, Bellis*, and the cases cited therein may well presage a trend toward elimination of the fifth amendment privilege for all business records, even when the proprietor is required to produce and thus implicitly authenticate them, *see, e. g., Andresen*, 427 U.S. at 486, 96 S.Ct. at 2751 (Brennan, J., dissenting); 1 K.C. Davis, *supra*, § 4:17, at 279; *id.* § 4:19, such a final break with *Boyd* is not for us to make. As we read the Supreme Court's most recent pronouncements, the fifth amendment still affords Gould, BACA's sole proprietor on the record we have before us, *see* Part (I) *supra*, the same protection for BACA's business papers as he claims for his own personal papers.

11144(b) are the equivalent of the subpoena power of other agencies. When the ICC seeks an injunction under section 11702(a)(4) to allow it access to inspect records, the judicial inquiry with regard to jurisdiction and reasonableness is similar to that employed when another agency seeks enforcement of its subpoena or summons. Nevertheless, a separate examination of the ICC inspection procedures must be undertaken to determine, for fifth amendment purposes, whether these procedures more closely resemble those involved in subpoena or summons practices or whether they are closer to the practices involved in a search and seizure. If the statutory ICC inspection resembles a subpoena or a summons procedure in a practical sense, then *Bellis* would control, and Gould may assert a fifth amendment privilege, subject, of course, to our discussion in Part (IV)(C) *infra* rejecting a blanket assertion of the privilege. On the other hand, an ICC inspection which partakes of the character of a search and seizure would trigger the *Andresen* rule and thus foreclose assertion of Gould's fifth amendment privilege.

Our difficulty here is that the record before us does not provide us with the means by which we can determine on which side of the line the ICC inspection procedure falls,[23] since the district court granted summary judgment for the ICC without addressing this issue.[24] If ICC agents conducting an inspection actually require the proprietor or his agents to point out, segregate, assemble, or turn over certain documents or categories of documents for examination on the proprietor's premises, then we can perceive little difference between such a visitorial inspection and the summons-subpoena procedures, where documents are similarly produced by the individual having control over them. While it is true that in a visitorial inspection the inspectors examine the documents on the business premises, and in the summons-subpoena context the documents are examined off premises at a place designated by the government, we can find no significance, in a fifth amendment context, to this difference. In both cases, the proprietor would be required to designate and produce the documents. Thus, in both cases, compliance on the part of the proprietor could amount to having his testimony compelled.

If, on the other hand, ICC agents, in the conduct of a visitorial inspection, seek no aid or assistance from the proprietor and do not ask for or require the designation or production of documents but rather through their own efforts attempt to locate the records they seek, the inspection would appear to lack any aspects of testimonial compulsion and could be analogized to a search and seizure.

We have obviously not attempted to catalog all of the features which are character-

---

**23.** Nor have we found any judicial or congressional discussion of this problem. We observe that *Midwest Growers* merely noted that the two modes of inspection—subpoena and visitorial—were equivalent, but did not discuss this equivalence in a fifth amendment context. *See* 533 F.2d at 461 & n. 14.

**24.** The September 11, 1979 order, from which appeal is taken, recites findings of fact made by the district court. However, it then grants summary judgment to the ICC permanently enjoining Gould from, among other things, refusing to produce or to permit access to his transportation-related records. We observe that the grant of summary judgment is incompatible with the resolution of disputed material facts. *Sanford v. O'Neill*, 616 F.2d 92, 96 (3d Cir. 1980). While in other circumstances, where a district court relied upon its own findings in determining the issues, we would have

difficulty in sustaining a summary judgment, we are not faced with that situation on this record. Here, despite the inclusion of "findings of fact" in its September 11, 1979 order, the district court concluded that indeed there were no material disputes of fact. As we have indicated above, while the record discloses some disagreement with respect to matters not essential to the issues, the record also discloses that the material facts and the essential events and the manner of their occurrence are not controverted. The district court was thus faced, as are we, with pure questions of law concerning the issues of jurisdiction and reasonableness. In such a situation, we are not precluded from affirming an order of summary judgment, as we undoubtedly would have done here had not the fifth amendment issue required a remand for the district court to make findings of fact and an evidentiary record.

istic of the summons-subpoena procedures or which inhere in a search and seizure. This task and the development of an evidentiary record with appropriate findings of fact require that we remand this proceeding to the district court for its attention in the first instance. In this connection, it would appear to us that the ICC would have the burden of producing evidence of its own procedures, and Gould, who seeks to assert a fifth amendment privilege, would have the burden of proving that the ICC statutory inspection is for this purpose analogous to the service upon him of a subpoena or a summons with their attendant rights.

If the district court concludes that the ICC statutory inspection most closely resembles a legally conducted search and seizure, it should issue the injunction requested by the ICC, since *Andresen's* rationale would allow a seizure of personal papers as well as business documents. *United States v. Praetorius*, 622 F.2d 1054 at 1062–1063 (2d Cir. 1979).[25] If, on the other hand, the district court concludes that the ICC procedure resembles most closely an agency subpoena, the ICC may be foreclosed from obtaining inspection of documents for which Gould is able to claim his fifth amendment privilege specifically, an issue to which we now address ourselves.[26]

### C.

Gould made a blanket fifth amendment objection to compliance with the ICC request for an inspection of his records. Such a blanket citation of the privilege against self-incrimination will not suffice as a valid claim of the privilege. In *National Life Insurance Co. v. Hartford Accident & Indemnity Co.*, 615 F.2d 595, 596 (3d Cir. 1980), we recently held "that a witness in a civil proceeding may not invoke a blanket fifth amendment privilege prior to the propounding of questions." In *In re U.S. Hoffman Can Corp.*, 373 F.2d 622, 626–27 (3d Cir. 1967), we held that the officers of a bankrupt corporation could not refuse to supply the information sought by a blanket invocation of fifth amendment privilege. Information and documents which "could not possibly be incrimination no matter how broadly the privilege is construed," *id.* at 672, could not be withheld. *Accord, United States v. Allshouse*, 622 F.2d 53 at 56 (3d Cir. 1980) (specific assertions of privilege required to avoid complying with tax summons). These cases establish that Gould may claim fifth amendment protection, if the fifth amendment is applicable at all,[27] only for specific documents or categories of documents which he can demonstrate to the court might tend to incriminate him.

**25.** The *Andresen* fact situation involved business records, and therefore, in a strict sense, the holding was limited to business records. But its stated rationale—that a search and seizure involves no "compulsion" violative of the fifth amendment's protection from being compelled to testify against oneself—seems to admit of no distinction based on the type or content of the documents seized. *See, e. g.,* 427 U.S. at 473 74, 96 S.Ct. at 2745 (dictum). *Praetorius* therefore denied fifth amendment protection where the defendant's passport was validly obtained by the Government. *Praetorius* confirms our belief that *Andresen* is not limited to business records. *Contra, Brink v. DaLesio*, 82 F.R.D. 664, 672 (D.Md.1979). In passing, we observe that in *Praetorius* the distinction between "search" and "subpoena" was not relevant as it is in this case because there the passport was not in the defendant's own possession.

**26.** Although not raised specifically in Gould's brief, his answer to the complaint asserts fourth amendment protection against unreasonable searches and seizures. App. at 20.

However, we fail to appreciate any fourth amendment issue in the context of our analysis. If Gould were to consent to the inspection there could be no fourth amendment objection. If Gould were to refuse consent, an injunction would then have to be obtained, since the ICC has no statutory authority to conduct warrantless searches without consent. *Midwest Growers*, 533 F.2d at 462 63. In fact, the ICC has no power even to obtain a search warrant; instead, it is remitted solely to obtaining an injunction to enforce its right of inspection. *Id.* at 463. Thus, we cannot foresee any issue of a warrantless search or any issue being raised as to the level of probable cause required for a warrant. And the showing of "reasonableness" required to obtain a court's injunction, see Part (III)(B) *supra*, appears to us to satisfy any fourth amendment concerns. *See Oklahoma Press*, 327 U.S. at 209, 215 16, 66 S.Ct. at 505, 508–09; *Brigadoon*, 480 F.2d at 1053–54; *Cooper's*, 330 F.2d at 340 41.

**27.** *See* Part (IV)(B) *supra*.

## V.

We have determined that the October 5, 1977 inspection request by ICC agents was within the ICC's statutory jurisdiction and was procedurally proper as well. However, despite this holding, the fifth amendment issue which has been raised by Gould requires us to remand this case to the district court for additional proceedings.

If the ICC demonstrates that BACA is in fact not a sole proprietorship or that some person other than Gould has possession of BACA's records, then the injunction previously issued by the district court would be appropriate because under *Bellis* or *Colucci* respectively the fifth amendment would be inapplicable. *See* Part (IV)(A) *supra*.

If such is not the case, however, and Gould either proves, or the ICC concedes, that he, Gould is the sole proprietor of BACA and the sole possessor of its records, and that consequently they are in fact one and the same, then if Gould persists in his fifth amendment claim the district court will be obliged to determine the validity of that claim in accordance with this opinion's discussion and holdings. Obviously, if Gould cannot establish a valid fifth amendment privilege, nothing herein contained would prevent the district court from entering an order identical to the September 11, 1979 order, which we now are obliged to vacate.

We will therefore vacate the September 11, 1979 order of the district court and remand to the district court for further proceedings not inconsistent with this opinion.

## APPENDIX

The following is a partial table of approximate cross-references: