652 F.Supp. 20 (1985)
UNITED STATES of America, Plaintiff,
v.
Sorkis WEBBE, Jr., et al., Defendants.
No. 83-242 CR (5).
United States District Court, E.D. Missouri, E.D.
October 28, 1985.
Memorandum Opinion March 21, 1986.
*21 Robert Ritchie, Knoxville, Tenn., for plaintiff.
Burton Shostak, St. Louis, Mo., for defendants.

ORDER
LIMBAUGH, District Judge.
Trial in this case began October 21, 1985, but before the voir dire began, a variety of motions were filed by defendants largely for the reason that Brady and Jencks Act material just furnished by the government prompted the filings. An evidentiary hearing on the motions began and was interrupted so that jury selection could commence. A jury was selected by 2:00 p.m. on October 24, 1985, and was impaneled but not sworn. The jury was ordered to report back for trial October 28, 1985. The remainder of October 24th and October 25th were spent completing the evidentiary hearing on the motions. All parties have briefed their positions on the motions and before the jury is sworn this order is entered.
The Court finds that the Jencks Act material furnished to defendants does not change the original findings of the Magistrate and former rulings of the Court as to the admissibility of electronic surveillance evidence. Findings of fact and conclusions of law will be set out in a separate memorandum.
*22 IT IS THEREFORE ORDERED that all motions to suppress electronic surveillance evidence and intercepted communications and derivative evidence, to suppress statements assertedly protected by the attorney-client privilege, to dismiss for pre-indictment delay and for government misconduct are DENIED and that request for an evidentiary hearing under Franks v. Delaware is DENIED;
IT IS FURTHER ORDERED that the statements obtained by electronic surveillance numbered Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 8a, 12, 13, 14, 15, 16, 17, 18, 19, 22, 25, 26, 27, 29, 34, 35, 36, 41, 43, 45, 47, 51, 53, 54 and 55 shall be received in evidence and the United States allowed to present same to the jury by tape recorder and ear phone device. Rulings on the use of written statements of the evidence shall be made at the time of the presentation of such evidence. Rulings on the additions to Exhibits 16, 17 and 19 offered by defendants under the rules of completeness shall be made in a separate order.

MEMORANDUM OPINION
On October 28, 1985, the Court denied renewed motions of all defendants to suppress electronic surveillance evidence and intercepted communications and derivative evidence, stating that findings of fact and conclusions of law would be set out in separate memorandum. This memorandum opinion constitutes those findings of fact and conclusions of law supporting such order.
During the discovery process, defendants Sorkis Webbe, Jr. and Pat Gandy moved to suppress electronic surveillance evidence and that, and other motions were referred to United States Magistrate David D. Noce for a hearing and recommendation. On September 24, 1985, Magistrate Noce filed a report and recommendation to which was attached memorandum considering the motions to suppress electronic surveillance evidence, for an evidentiary hearing under Franks v. Delaware and for leave to file an additional memorandum regarding an unincorporated affidavit and other issues. The motions, as filed, were adopted by all defendants. The memorandum of the United States Magistrate addressed all of the issues raised by the defendants in substantial detail and the order of the United States Magistrate denying the relief requested in the motions was adopted by this Court.
Trial of this case began October 21, 1985. On October 17, 1985, the United States Attorney sent a letter to the Court and to the attorneys of record advising the parties that one Hamilton Lemmer would testify for the government. The letter suggested that pursuant to court order of October 15, 1982, the Federal Bureau of Investigation (F.B.I.) initiated electronic surveillance in the offices of defendants Sorkis Webbe, Sr., and Sorkis Webbe, Jr., at the Mayfair Hotel, in the City of St. Louis. Shortly before the court order was entered, Hamilton Lemmer, at the direction of the F.B.I., retrieved keys from the purse and desk of one Cheryl Knapp at such hotel and made impressions of said keys. The impressions were then turned over to the F.B.I. and F.B.I. agents made copies of the keys and used those keys after the court order was obtained to gain entry to the Webbe office area for purposes of installing the surveillance equipment. The foregoing information was given to counsel four days before trial, as it might be considered Brady or Jencks Act material.
During the discovery period, and before trial, defendant Sorkis Webbe, Sr. died, an apparent victim of cancer.
Shortly before the voir dire began, defendants filed a variety of motions which were prompted by the material furnished in the letter of October 17, 1985. The principal motion was a renewal of the original motion of the defendants to suppress intercepted communication and derivative evidence. An evidentiary hearing on the motions began, and was interrupted so that jury selection could commence. A jury was selected by 2:00 p.m. on October 24, 1985, and was impaneled, but not sworn. The jury was ordered to report back for trial on October 28, 1985. The remainder of October *23 24th and all of October 25th were spent completing the evidentiary hearing on the renewed motion to suppress. On October 28, 1985, before the jury was sworn, the Court entered its order denying the renewed motion to suppress.
The only new evidence presented on the renewed motion to suppress was that presented to the Court before the jury was sworn, all other evidence having been presented to the United States Magistrate at the time of the original hearing. This new evidence consisted of the live testimony of Hamilton Lemmer, a paid government informer, Cheryl Knapp, the Director of Sales of the Mayfair Hotel and personal secretary of defendant Sorkis Webbe, Jr., defendant Sorkis Webbe, Jr. and several exhibits. As stated in the thorough and exhaustive memorandum of the United States Magistrate of September 24, 1985, the original motion was to suppress the recorded conversations which resulted from electronic surveillance of oral communications in the Mayfair Hotel offices of Sorkis Webbe, Sr. and Sorkis Webbe, Jr. By an order dated October 15, 1982, the District Court in Cause No. 82-MISC-329 authorized the interception of the oral communications of a variety of parties, including Webbe, Sr. and Jr. in two offices on the third floor of the Mayfair Hotel in St. Louis, MO. The court order, issued by Hon. H. Kenneth Wangelin was granted under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Act" or "Title III"), as amended, 18 U.S.C. § 2510-2520. The issue now before the Court is whether Judge Wangelin would have issued the order of surveillance or would have had the authority to do so had the evidence adduced in support of the renewed motion to suppress been available to him. This evidence involves, in brief, the purported Brady or Jencks Act material described in the government's letter to the Court and counsel of October 17, 1985.
The defendants maintain that as a way of obtaining entry or access to the offices which were to be surveilled was obtained illegally before Judge Wangelin entered the order for surveillance, defendant Webbe, Jr.'s statutory and constitutional rights were violated. Defendants reason that if Judge Wangelin knew before he entered the surveillance order that the government already had illegally obtained a way to gain access to the offices to be surveilled, he might not have entered the order. Defendants maintain, in addition, that the method of obtaining access to the office to be surveilled was in itself an illegal search and seizure and a violation of defendant Webbe, Jr.'s fourth amendment rights.
The Court finds, from the new evidence, that the Mayfair Hotel located in the City of St. Louis, Missouri, including the land, the physical facility and the furniture, furnishings, equipment and contents were owned by a partnership known as the Prestige Hotels. Webbe, Jr. owned an approximate 10% of the partnership and other parties, not involved with this litigation owned the remaining interests. Charsar, Inc., a corporation, had a management contract with Prestige to operate the Mayfair Hotel. Webbe, Jr. served as the general manager of the hotel as an employee of Charsar. During much of the time in question, Webbe, Jr. also served as a member of the Board of Aldermen of the City of St. Louis representing the Seventh Ward.
The business office for the hotel management was located on the third floor of the hotel. That business office was also used by Webbe, Jr. for the purpose of conducting St. Louis City Seventh Ward and other political business. A sketch of the third floor, copy of which is attached to this opinion, shows the layout of the facilities. The hotel business offices are located on the north and the east side of the floor. Law offices, hotel guest rooms, stairways and elevators and a storage area for the hotel business are situated on the south side. These offices are separated by a common hall leading to the elevators and the stairs.
During October, 1982, the time in question, the law offices were occupied and clients of the attorneys came to the third *24 floor for consultation. Guests of the hotel also occupied two guest suites on the third floor and these guests and clients used the elevators and the stairs and the common hallway on the third floor.
Webbe, Jr. and Sr. occupied personal offices at the northeast corner of the third floor layout. Access to these offices was had by a hallway leading to the elevators or the stairs. That hallway was the same one utilized by the hotel guests as well as law office clients. Access to the Webbe offices was obtained from the hallway through two glass doors leading to a receptionist's room. The receptionist's room borders a hallway leading to the two separate offices, each of which has separate doors. The office located at the extreme northeast corner was that of Webbe, Jr.'s and Webbe, Sr.'s office was located west thereof with the two private offices being separated only by bath and closet facilities.
Room 306 is the fifth office west of Webbe, Sr.'s office. That room is occupied by Cheryl Knapp, personal secretary of Webbe, Jr. and the director of sales for the Mayfair Hotel. She began work in that capacity in September, 1982. Knapp was also a volunteer worker for the Seventh Ward and assisted Webbe, Jr., as a part of her duties in carrying out his political activities. Webbe, Jr. occasionally used Room 306 for his own purposes when his personal office was in use. Knapp also, on occasion, performed some of her work in the office of the receptionist.
Both Webbe, Jr. and Knapp knew Hamilton Lemmer, a government informer; however, they did not know that Lemmer was a government informer until approximately ten days before trial.
During the summer and fall of 1982, Lemmer and others involved with Seventh Ward politics were frequent visitors to the third floor business offices of the Mayfair Hotel. Webbe, Jr. felt that Lemmer was his friend and political ally. Lemmer would not come to the offices every day, but came often. He would visit with Webbe, Jr. in his private office and also with Knapp in Room 306. He was never denied entrance to Webbe, Jr.'s office unless Webbe was involved with a personal conference with someone else.
It was Lemmer's purpose in visiting Webbe and Knapp to conduct political business and engage in conversation. He did this initially as a Seventh Ward worker and later as a precinct captain in the Soulard area. A variety of other persons regularly visited the third floor of the hotel for the same purpose of conducting political business with Webbe, Jr., or Knapp.
The doors to the various business offices on the third floor of the Mayfair Hotel were generally closed and locked after business hours. If a hotel guest or a law office client went to the third floor after business hours, someone would authorize access for that person. The stairs, however, were always open for hotel guests or law office visitors.
There are separate keys for the glass doors leading from the hallway to the receptionist's room, the door leading to Webbe, Jr.'s office, the door leading to Webbe, Sr.'s office and the door leading to Room 306. Knapp had a key given to her by Webbe, Jr. to each of such doors and a hotel room master key. She kept these keys on her person or in her purse or in a desk drawer. Webbe, Jr. was the only other person who had the same keys as did Knapp. Knapp was not authorized by Webbe to entrust the keys to anyone else. Neither Knapp nor Webbe, Jr. authorized Lemmer at any time to take or use the keys for any purpose.
Sometime in early October, 1982, an agent of the F.B.I. to whom Lemmer, as a paid informant reported, asked Lemmer to secure prints of keys to the glass doors leading from the hallway to the receptionist's area on the third floor of the Mayfair Hotel and to the separate doors leading into Webbe, Jr.'s and Webbe, Sr.'s private offices at the northeast corner of the facility. Lemmer agreed to obtain imprints of these keys and did so on four occasions. He also obtained the names of security personnel and key personnel who might be in the executive office area, other than *25 Webbe, Jr. and Sr. In addition, he obtained locations of certain telephone closets. The telephone closet box was obtained when Lemmer was on the second floor of the Mayfair Hotel attending a function that was held in the bar in that area. On certain occasions, when Lemmer was in the personal offices of Webbe, Sr. and Jr., he made mental notes of the location and identifications of office furniture and prepared a sketch of these items which was turned over to the F.B.I. The visits that were made for the purpose of obtaining imprints of keys to the executive doors were generally during the lunch hour or during the early afternoon, except on one occasion which was near 5:00 p.m. in the evening. The four times that keys were obtained for the purpose of making impressions occurred a day or two apart over a period of a week to ten days sometime during October, 1982. Lemmer continued to visit the third floor offices frequently after October of 1982, for the purpose of carrying on political business. During these times, he maintained his practice of visiting Webbe, Jr. and Knapp.
Before any key tracings were made, Lemmer, on visits with Knapp, had seen her use keys from a keychain. He had been present and had seen her use a keychain which contained two or three keys and had seen her use one or more of these keys to open doors to the executive offices. On one occasion, he stood beside Knapp, talking with her while she used a key from her keyring to open the door from the reception room passing to Webbe, Jr.'s office. He was able to see which key was used for this purpose. Lemmer had not seen Knapp or any other person use a key to go into the private office of Webbe, Sr. or to pass from the public hallway through the glass doors to the reception area.
On the first occasion an imprint was obtained, Lemmer was visiting with Knapp in Room 306 and noticed Knapp's purse on the floor immediately adjacent to the left side of the desk. Knapp left Room 306 to perform other duties and Lemmer picked up the purse, and searched it for keys. Lemmer extracted a keyring containing two keys from the purse, and made a tracing of these keys. This was done by laying the key on a piece of paper and tracing the outline of the key with a pencil onto the paper. The keys were then inserted back into the purse which was placed at its original position, following which Knapp returned. Lemmer thereafter continued to converse with Knapp and ultimately left. He then gave the tracing to his F.B.I. contact. Lemmer felt that these two imprints were of keys to the glass doors going from the hall to the receptionist's room and the door going into Webbe, Jr.'s personal office.
The second time that Lemmer obtained prints of keys was about 4:30 or 5:00 in the evening. On this occasion, Knapp was in the reception room and Lemmer visited her there. They had previously been in Room 306 and Knapp was required to go to the reception room and Lemmer accompanied her. Both intended to leave the premises, but Knapp was required to go to the reception room first. While there, Knapp left her purse either on the desk in the reception area or near the desk on the floor and then was required to leave the reception room for another mission. Thereafter, Lemmer took certain keys from Knapp's purse and went to a rest room and made a wax impression of the keys from a kit which he was carrying on his person. The kit was provided by the F.B.I. There were either two or three keys on the ring from which impressions were made of only two. Lemmer then returned to the receptionist's area and replaced the keys in the purse and shortly thereafter, Knapp returned to the receptionist's room, as well. A few moments later, both parties left the premises by elevator and each went their own way. The wax impressions of these two keys were given by Lemmer to his F.B.I. contact.
On the third occasion, Lemmer was again visiting Knapp in Room 306. Knapp was required to leave the room, and Lemmer looked in Knapp's purse and did not find the keys. He then opened the top knee drawer of Knapp's desk and saw the keys *26 inside the drawer. On this occasion, Lemmer made wax prints of two keys and then returned the keys to the desk drawer where he had found them. A few moments later Knapp returned and Lemmer continued his conversation with her, and ultimately left. Again, on this occasion, he gave the wax impressions to his F.B.I. contact.
On the fourth occasion, Lemmer was visiting the staff of the attorney occupying the law office suite on the third floor of the hotel. Lemmer would act, on occasion, as process server for the attorney and he had appeared there for the purpose of determining whether there was work for him to do. Finding none, he went to Room 306 where he began visiting with Knapp. During the visit, Knapp was required to leave Room 306 and Lemmer then saw Knapp's purse on the floor near her desk. He took keys from the purse and went to the bathroom in Room 306 and made prints of two keys during Knapp's absence. He returned the keys to her purse and replaced the purse where he found it before Knapp returned. He finished his conversation with Knapp, left the premises and ultimately gave the prints to the F.B.I. contact.
In the order of October 15, 1982, entered by Judge H. Kenneth Wangelin at 10:35 a.m. C.D.T., special agents of the F.B.I. were authorized to enter the Webbe offices located at the northeast corner of the third floor of the Mayfair Hotel "surreptitiously or by ruse for the purpose of installing, maintaining and removing any electronic, oral interception devices utilized pursuant to the authority granted (in the) order and to permit connection to telephone lines, if necessary." After that order was entered, special agents of the F.B.I. did, in fact, enter the private office of Webbe, Jr. and Webbe, Sr. as detailed on the exhibit attached to this memorandum opinion and plant an electronic bugging device. Entry was obtained with keys made from the imprints obtained by Hamilton Lemmer. Lemmer was not involved in the making of the keys or in the use thereof for the purpose of the installation of the electronic equipment. Tape recordings of conversation of parties in the offices bugged were received by the Court and made available to the jury in the trial of the case. The first of these conversations occurred December 30, 1982, and all other conversations occurred during the months of February, March, April, May and June, 1983.
The defendants are entitled to suppress evidence only if they demonstrate that they have standing to assert the illegality of the conduct alleged by Hamilton Lemmer. In the instant matter, defendants must demonstrate standing to assert a violation of the Fourth Amendment to the Constitution. In order to establish standing, each defendant must show that the challenged conduct of Lemmer violated the legitimate expectations of privacy of each. A defendant's Fourth Amendment rights are violated only when the challenged conduct invades his or her legitimate expectation of privacy rather than that of a third party. Rawlings v. Kentucky, 448 U.S. 98, 104-06, 100 S.Ct. 2556, 2561-62, 65 L.Ed.2d 633 (1980). Defendants Gandy, Clark and Townsley have offered no reasons to indicate or show that Lemmer's conduct invaded their legitimate expectation of privacy and the Court determines, therefore, that no one of them have demonstrated standing to assert a violation of the Fourth Amendment.
Defendant Webbe, Jr., has the burden of proving that he had a legitimate expectation of privacy to the keys which had been entrusted by him to Cheryl Knapp, for it was these keys that were removed by Lemmer for the purpose of making imprints for duplicates. The Court finds that defendant Webbe, Jr. also has not met the burden of proving that he had a legitimate expectation of privacy to such keys. Although Webbe, Jr. entrusted the keys to Knapp, he was fully aware that she would be carrying the keys on her person or in a handbag, and that they could be left in any of the offices wherein Knapp was required to carry out her obligations. It could further be expected that Knapp would take these keys with her to her place of residence, or carry them with her, at all *27 times, outside the premises of the hotel because she frequently arrived early to open the doors of the administrative offices for business. It is obvious, therefore, that Knapp had control and supervision of such keys even though she was a Webbe employee, and even though Webbe, Jr. may have directed that Knapp not relinquish possession of the keys to any other person. Rawlings v. Kentucky, supra; Rakas v. Illinois, 439 U.S. 128, 148-149, 99 S.Ct. 421, 432-33, 58 L.Ed.2d 387 (1978).
Although Webbe, Jr. had a legitimate expectation of privacy in his personal office, he did not have it in the reception office and in the other business offices on the third floor of the Mayfair Hotel. The only time Lemmer was in Webbe, Jr.'s personal office was for political purposes and the only intrusion he may have made, at that time, was to make mental notes of the location of furniture in such office. The taking of the keys was accomplished three times in Room 306, and one time in the receptionist's office only. Room 306 was occupied principally by Knapp as her office, although, Webbe would, occasionally, use this office for personal purposes when his own office was in other use. All manner of business and political persons entered Room 306 and the receptionist's office regularly. Lemmer, as well as many other political allies of Webbe were regularly in Room 306, and in the receptionist's office. Lemmer even worked as a process server for the occupants of the law office on the third floor. He was a known visitor to the overall area before, during and after the period of time he obtained the keys. Webbe's Fourth Amendment rights were not violated by Lemmer's presence in Room 306 and the receptionist's area. U.S. v. Williams, 565 F.Supp. 353, 361 (N.D.Ill.E. D.1983), aff. 737 F.2d 594 (7th Cir.1984).
Certainly, Webbe had no legitimate expectation of privacy in all of the offices on the third floor because of ownership. Although Webbe was the manager of the hotel, the land on which the hotel was situated, the hotel structure itself and all contents were owned by a partnership of which Webbe, Jr. had a 10% interest only. These facts are not sufficient to establish a legitimate expectation of privacy by Webbe in Room 306 and the receptionist's area. U.S. v. Vicknair, 610 F.2d 372, 379 (5th Cir.1980); Bellis v. U.S., 417 U.S. 85, 98, 94 S.Ct. 2179, 2188, 40 L.Ed.2d 678 (1974); ICC v. Gould, 629 F.2d 847, 858, 859, n. 21 (3rd Cir.1980).
To reiterate, while defendant Webbe, Jr. had a legitimate expectation of privacy in his personal office located at the extreme northeast corner on the third floor of the hotel, the unlawful acts complained of were not performed by Hamilton Lemmer in that office. They were performed in the receptionist's area and in Room 306. The legitimate expectation of privacy by Webbe, Jr. can only be violated by searches of areas he has sought to keep private by using them in a way that prevents them from being freely accessible to other people. U.S. v. Williams, at 361, supra. Room 306 and the receptionist's area were freely accessible to other people. All persons conducting hotel business must use the receptionist's office. In addition, that office and Room 306 were heavily used by political affiliates of Webbe, and they regularly went in and out of such rooms. The Court is convinced from the evidence that they were never sought to be private, and on the contrary political affiliates, and others, were encouraged to use those rooms freely.
Assuming arguendo that defendant Webbe had standing to challenge the conduct of Lemmer in obtaining imprints of the keys, Lemmer's activities still would not entitle defendant Webbe to suppress the evidence of the tapes. Defendant Webbe may only suppress the interceptions which would not have occurred but for the unlawful conduct. U.S. v. Williams at 366, supra. When an authorization for Title III surveillance is issued, it is clear that the government may enter, surreptitiously, the Webbe premises to plant microphones. Dalia v. U.S., 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979). There is no claim made by defendant Webbe that *28 the entry by F.B.I. agents and the planting of the microphones in his personal office, done in a surreptitious fashion was improper. The allegation of wrongdoing is that the entry by the F.B.I. was made as a result of alleged wrongful conduct of Hamilton Lemmer in obtaining imprints so that keys could be made to enable the F.B.I. to have access to the target area, such conduct being performed before the court's authorization of surveillance.
Would the implanting of the bugging devices and the resultant interceptions have occurred without the participation of Lemmer before the court's order of surveillance entered October 15, 1982? This Court finds that they would have. There was ample time for Lemmer to have obtained imprints of the keys after October 15th. He could have obtained the same prints in seven to ten days after October 15, 1982, as he did before. The evidence is unrefuted that Lemmer continued his practice of frequenting the third floor of the Mayfair Hotel regularly after October 15, 1982, well into the middle of the year, 1983. The first recorded evidence played to the jury of tapes of conversations of persons in Webbe, Jr.'s office was December 30, 1982. Lemmer would have had ample time after the court order of surveillance of October 15, 1982, to have obtained prints of the keys and the F.B.I. could have had the keys made and gained access for the purpose of installing the electronic bugging devices long before December 30, 1982.
The fact that Lemmer obtained the necessary prints of keys before the court order of entry as a part of the overall mechanics for gaining a surreptitious entry is not consequential under the facts of this case. Once the court order of surveillance was entered, it was obvious that the government had the means at hand to have obtained the interceptions thereafter. It is also obvious that access to the Webbe private offices after the court order could have been had surreptitiously by means other than contacts with Hamilton Lemmer. Two suites on the third floor of the Mayfair Hotel were available to the general public for hotel room usage. Those suites could have been occupied in the normal course of business by government personnel posing as hotel guests or law office visitors, who could have, quite easily, gained access through surreptitious efforts to Webbe, Jr.'s private office. Given the layout of the third floor of the hotel and public access thereto, access could have been gained, surreptitiously, in a myriad of other ways, as well. Defendant's argument in this area also is without merit. U.S. v. Williams at 366 and 367, supra.
Defendant Webbe, Jr.'s renewed motion to suppress intercepted communications and derivative evidence joined in by the other defendants should be denied.